# *PRELIMINARY PRINT*

## VOLUME 600 U. S. PART 1

### PAGES 122–180

---

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 27, 2023

Page Proof Pending Publication

---

## REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# MALLORY *v.* NORFOLK SOUTHERN RAILWAY CO.

### CERTIORARI TO THE SUPREME COURT OF PENNSYLVANIA, EASTERN DISTRICT

No. 21–1168.   Argued November 8, 2022—Decided June 27, 2023

Robert Mallory worked for Norfolk Southern as a freight-car mechanic for nearly 20 years, first in Ohio, then in Virginia.   After he left the company, Mr. Mallory moved to Pennsylvania for a period before returning to Virginia.   Along the way he was diagnosed with cancer.   Because he attributed his illness to his work at Norfolk Southern, Mr. Mallory sued his former employer under the Federal Employers' Liability Act, 45 U. S. C. §§ 51–60, a federal workers' compensation scheme permitting railroad employees to recover damages for their employers' negligence. Mr. Mallory filed his lawsuit in Pennsylvania state court.   Norfolk Southern—a company incorporated in Virginia and headquartered there—resisted the suit on the basis that a Pennsylvania court's exercise of personal jurisdiction over it would offend the Due Process Clause of the Fourteenth Amendment.   Norfolk Southern noted that when the complaint was filed, Mr. Mallory resided in Virginia, and the complaint alleged that Mr. Mallory was exposed to carcinogens only in Ohio and Virginia.   Mr. Mallory pointed to Norfolk Southern's presence in Pennsylvania, noting that Norfolk Southern manages over 2,000 miles of track, operates 11 rail yards, and runs 3 locomotive repair shops in Pennsylvania.   In fact, Norfolk Southern has registered to do business in Pennsylvania in light of its "'regular, systematic, [and] extensive'" operations there.   266 A. 3d 542, 562; see 15 Pa. Cons. Stat. § 411(a). And Pennsylvania requires out-of-state companies that register to do business in the Commonwealth to agree to appear in its courts on "any cause of action" against them.   42 Pa. Cons. Stat. § 5301(a)(2)(i), (b). By complying with this statutory scheme, Mr. Mallory submitted, Norfolk Southern had consented to suit in Pennsylvania on claims just like his.

   The Pennsylvania Supreme Court sided with Norfolk Southern. That court found that the Pennsylvania law—requiring an out-of-state firm to answer in the Commonwealth any suits against it in exchange for status as a registered foreign corporation and the benefits that entails— violates the Due Process Clause.

*Held:* The judgment is vacated, and the case remanded.   This case is controlled by *Pennsylvania Fire Ins. Co. of Philadelphia* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93.   Much like the Missouri law that the Court in *Pennsylvania Fire* found to comport with the Due Process

Syllabus

Clause, the Pennsylvania law at issue here provides that an out-of-state corporation "may not do business in this Commonwealth until it registers with" the Department of State. 15 Pa. Cons. Stat. § 411(a). Among other things, Pennsylvania law is explicit that "qualification as a foreign corporation" shall permit state courts to "exercise general personal jurisdiction" over a registered foreign corporation, just as they can over domestic corporations. 42 Pa. Cons. Stat. § 5301(a)(2). Norfolk Southern has complied with this law since 1998, when it registered to do business in Pennsylvania. Norfolk Southern applied for a "Certificate of Authority" from the Commonwealth which, once approved, conferred on Norfolk Southern both the benefits and burdens shared by domestic corporations, including amenability to suit in state court on any claim. For more than two decades, Norfolk Southern has agreed to be found in Pennsylvania and answer any suit there.

*Pennsylvania Fire* held that suits premised on these grounds do not deny a defendant due process of law. Mr. Mallory no longer lives in Pennsylvania and his cause of action did not accrue there. But none of that makes any difference. To decide this case, the Court need not speculate whether any other statutory scheme and set of facts would suffice to establish consent to suit. It is enough to acknowledge that the state law and facts before the Court fall squarely within *Pennsylvania Fire*'s rule.

In the proceedings below, the Pennsylvania Supreme Court seemed to recognize that *Pennsylvania Fire* dictated an answer in Mr. Mallory's favor but ruled for Norfolk Southern because, in its view, intervening decisions from this Court had "implicitly overruled" *Pennsylvania Fire*. See 266 A. 3d, at 559, 567. That was error. As this Court has explained: "If a precedent of this Court has direct application in a case," as *Pennsylvania Fire* does here, a lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484. This is true even if the lower court thinks the precedent is in tension with "some other line of decisions." *Ibid.* Pp. 134–136.

266 A. 3d 542, vacated and remanded.

GORSUCH, J., announced the judgment of the Court, delivered the opinion of the Court with respect to Parts I and III–B, in which THOMAS, ALITO, SOTOMAYOR, and JACKSON, JJ., joined, and an opinion with respect to Parts II, III–A, and IV, in which THOMAS, SOTOMAYOR, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion, *post*, p. 147. ALITO, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 150. BARRETT, J., filed a dissenting opinion, in which ROBERTS, C. J., and KAGAN and KAVANAUGH, JJ., joined, *post*, p. 163.

Counsel

*Ashley Keller argued* the cause for petitioner. With him on the briefs were *Warren Postman, Matthew A. Seligman, Daniel C. Levin, Frederick S. Longer,* and *Zina Bash.*

*Carter G. Phillips* argued the cause for respondent. With him on the brief were *Tobias Loss-Eaton, Ralph G. Wellington, Bruce P. Merenstein, Daniel B. Donahoe,* and *Ira L. Podheiser.*

*Deputy Solicitor Gannon* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Vivek Suri, Sharon Swingle,* and *Joshua M. Koppel.**

---

*Briefs of *amici curiae* urging reversal were filed for the Academy of Rail Labor Attorneys by *Lawrence M. Mann, William L. Myers, Jr.,* and *Robert E. Myers*; for the American Association for Justice by *Jeffrey R. White*; for the Center for Auto Safety et al. by *Larry E. Coben* and *Michael Brooks*; for the Pennsylvania Association for Justice *by Ruxandra M. Laidacker* and *Charles L. Becker*; and for Public Citizen by *Scott L. Nelson* and *Allison M. Zieve.* Briefs of *amici curiae* urging vacatur were filed for Civil Procedure Professors by *Alan B. Morrison*; and for Stephen E. Sachs by *Mr. Sachs, pro se.*

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Virginia by *Jason S. Miyares,* Attorney General of Virginia, *Chuck Slemp,* Chief Deputy Attorney General, *Andrew N. Ferguson,* Solicitor General, *Erika L. Maley,* Principal Deputy Solicitor General, *Lucas W. E. Croslow,* Deputy Solicitor General, and *Annie Chiang,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Treg Taylor* of Alaska, *Leslie Rutledge* of Arkansas, *Lawrence G. Wasden* of Idaho, *Todd Rokita* of Indiana, *Austen Knudsen* of Montana, *John Formella* of New Hampshire, and *Alan Wilson* of South Carolina; for the Association of American Railroads by *Thomas H. Dupree, Jr., Jacob T. Spencer,* and *Daniel Saphire*; for the Atlantic Legal Foundation by *Lawrence S. Ebner*; for the Chamber of Commerce of the United States of America et al. by *Peter B. Rutledge* and *Jennifer B. Dickey, Mark Behrens,* and *Richard Pianka*; for the DRI Center for Law and Public Policy et al. by *Zach Chaffee-McClure*; for the National Association of Manufacturers et al. by *Philip S. Goldberg* and *Linda E. Kelly*; for the Pennsylvania Coalition for Civil Justice Reform et al. by *James M. Beck*; for the Washington Legal Foundation by *John M. Masslon II* and *Cory L. Andrews*; for Lea Brilmayer by *Scott A. Eisman, Timothy P. Harkness,*

Opinion of the Court

JUSTICE GORSUCH announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and III–B, and an opinion with respect to Parts II, III–A, and IV, in which JUSTICE THOMAS, JUSTICE SOTO-MAYOR, and JUSTICE JACKSON join.

Imagine a lawsuit based on recent events. A few months ago, a Norfolk Southern train derailed in Ohio near the Pennsylvania border. Its cargo? Hazardous chemicals. Some poured into a nearby creek; some burst into flames. In the aftermath, many residents reported unusual symptoms.[1] Suppose an Ohio resident sued the train conductor seeking compensation for an illness attributed to the accident. Suppose, too, that the plaintiff served his complaint on the conductor across the border in Pennsylvania. Everyone before us agrees a Pennsylvania court could hear that lawsuit consistent with the Due Process Clause of the Fourteenth Amendment. The court could do so even if the conductor was a Virginia resident who just happened to be passing through Pennsylvania when the process server caught up with him.

Now, change the hypothetical slightly. Imagine the same Ohio resident brought the same suit in the same Pennsylvania state court, but this time against Norfolk Southern. Assume, too, the company has filed paperwork consenting to appear in Pennsylvania courts as a condition of registering to do business in the Commonwealth. Could a Pennsylvania court hear that case too? You might think so. But today,

----

*Linda H. Martin*, and *David Y. Livshiz*; and for Tanya Monestier by *Sean Marotta*.

Briefs of *amici curiae* were filed for Scholars on Corporate Registration and Jurisdiction by *Andrew S. Pollis*; for United Policyholders by *George M. Plews*, *Peter M. Racher*, *Kevin M. Toner*, *Christopher E. Kozak*, and *Richard B. Oatis*; and for U. S. Terror Victims by *Eric Citron*.

[1] See U. S. Environmental Protection Agency, East Palestine, Ohio Train Derailment (June 21, 2023), https://www.epa.gov/east-palestine-oh-train-derailment.

Norfolk Southern argues that the Due Process Clause entitles it to a more favorable rule, one shielding it from suits even its employees must answer. We reject the company's argument. Nothing in the Due Process Clause requires such an incongruous result.

I

Robert Mallory worked for Norfolk Southern as a freight-car mechanic for nearly 20 years, first in Ohio, then in Virginia. During his time with the company, Mr. Mallory contends, he was responsible for spraying boxcar pipes with asbestos and handling chemicals in the railroad's paint shop. He also demolished car interiors that, he alleges, contained carcinogens.

After Mr. Mallory left the company, he moved to Pennsylvania for a period before returning to Virginia. Along the way, he was diagnosed with cancer. Attributing his illness to his work for Norfolk Southern, Mr. Mallory hired Pennsylvania lawyers and sued his former employer in Pennsylvania state court under the Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60. That law creates a workers' compensation scheme permitting railroad employees to recover damages for their employers' negligence. See *Norfolk Southern R. Co.* v. *Sorrell*, 549 U. S. 158, 165–166 (2007).

Norfolk Southern resisted Mr. Mallory's suit on constitutional grounds. By the time he filed his complaint, the company observed, Mr. Mallory resided in Virginia. His complaint alleged that he was exposed to carcinogens in Ohio and Virginia. Meanwhile, the company itself was incorporated in Virginia and had its headquarters there too.[2] On these facts, Norfolk Southern submitted, any effort by a Pennsylvania court to exercise personal jurisdiction over it would offend the Due Process Clause of the Fourteenth Amendment.

--------

[2] After Mr. Mallory commenced this suit, Norfolk Southern relocated its headquarters to Georgia. See Brief for Respondent 5.

Opinion of the Court

Mr. Mallory saw things differently. He noted that Norfolk Southern manages over 2,000 miles of track, operates 11 rail yards, and runs 3 locomotive repair shops in Pennsylvania. He also pointed out that Norfolk Southern has registered to do business in Pennsylvania in light of its "'regular, systematic, [and] extensive'" operations there. 266 A. 3d 542, 562 (Pa. 2021); see 15 Pa. Cons. Stat. §411(a) (2014). That is significant, Mr. Mallory argued, because Pennsylvania requires out-of-state companies that register to do business in the Commonwealth to agree to appear in its courts on "any cause of action" against them. 42 Pa. Cons. Stat. §5301(a)(2)(i), (b) (2019); see 266 A. 3d, at 564. By complying with this statutory scheme, Mr. Mallory contended, Norfolk Southern had consented to suit in Pennsylvania on claims just like his.

Ultimately, the Pennsylvania Supreme Court sided with Norfolk Southern. Yes, Mr. Mallory correctly read Pennsylvania law. It requires an out-of-state firm to answer any suits against it in exchange for status as a registered foreign corporation and the benefits that entails. *Id.*, at 561–563. But, no, the court held, Mr. Mallory could not invoke that law because it violates the Due Process Clause. *Id.*, at 564–568. In reaching this conclusion, the Pennsylvania Supreme Court acknowledged its disagreement with the Georgia Supreme Court, which had recently rejected a similar due process argument from a corporate defendant. *Id.*, at 560, n. 13 (citing *Cooper Tire & Rubber Co.* v. *McCall*, 312 Ga. 422, 863 S. E. 2d 81 (2021)).

In light of this split of authority, we agreed to hear this case and decide whether the Due Process Clause of the Fourteenth Amendment prohibits a State from requiring an out-of-state corporation to consent to personal jurisdiction to do business there. 596 U. S. —— (2022).[3]

_____

[3] The Pennsylvania Supreme Court did not address Norfolk Southern's alternative argument that Pennsylvania's statutory scheme as applied here violates this Court's dormant Commerce Clause doctrine. See 266

## II

The question before us is not a new one. In truth, it is a very old question—and one this Court resolved in *Pennsylvania Fire Ins. Co. of Philadelphia* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93 (1917). There, the Court unanimously held that laws like Pennsylvania's comport with the Due Process Clause. Some background helps explain why the Court reached the result it did.

Both at the time of the founding and the Fourteenth Amendment's adoption, the Anglo-American legal tradition recognized that a tribunal's competence was generally constrained only by the "territorial limits" of the sovereign that created it. J. Story, Commentaries on the Conflict of Laws § 539, pp. 450–451 (1834) (Story); see also *United States* v. *Union Pacific R. Co.*, 98 U. S. 569, 602–603 (1879). That principle applied to all kinds of actions, but cashed out differently based on the object of the court's attention. So, for example, an action *in rem* that claimed an interest in immovable property was usually treated as a "*local*" action that could be brought only in the jurisdiction where the property was located. 3 W. Blackstone, Commentaries on the Laws of England 117–118, 294 (1768). Meanwhile, an *in personam* suit against an individual "for injuries that might have happened any where" was generally considered a "*transitory*" action that followed the individual. *Id.*, at 294. All of which meant that a suit could be maintained by anyone on any claim in any place the defendant could be found. Story § 538, at 450.

American courts routinely followed these rules. Chief Justice Marshall, for one, was careful to distinguish between local and transitory actions in a case brought by a Virginia plaintiff against a Kentucky defendant based on a fraud perpetrated in Ohio. *Massie* v. *Watts*, 6 Cranch 148, 162–163

A. 3d, at 559–560, nn. 9, 11. Nor did we grant review to consider that question. Accordingly, any argument along those lines remains for consideration on remand.

(1810). Because the action was a transitory one that followed the individual, he held, the suit could be maintained "wherever the [defendant] may be found." *Id.*, at 158, 161–163; see also, *e. g.*, *Livingston* v. *Jefferson*, 15 F. Cas. 660, 663–664 (No. 8,411) (CC Va. 1811) (opinion of Marshall, C. J.); *Peabody* v. *Hamilton*, 106 Mass. 217, 220–221 (1870); *Bissell* v. *Briggs*, 9 Mass. 462, 468–470 (1813).

This rule governing transitory actions still applies to natural persons today. Some call it "tag" jurisdiction. And our leading case applying the rule is not so old. See *Burnham* v. *Superior Court of Cal.*, *County of Marin*, 495 U. S. 604 (1990). The case began with Dennis Burnham's business trip to California. *Id.*, at 608 (plurality opinion). During his short visit, Mr. Burnham's estranged wife served him with a summons to appear in California state court for divorce proceedings. *Ibid.* This Court unanimously approved the state court's exercise of personal jurisdiction over Mr. Burnham as consistent with the Due Process Clause— and did so even though the Burnhams had spent nearly all their married life in New Jersey and Mr. Burnham still resided there. See *id.*, at 607–608, 616–619; *id.*, at 628 (White, J., concurring in part and concurring in judgment); *id.*, at 635–639 (Brennan, J., concurring in judgment); *id.*, at 640 (Stevens, J., concurring in judgment).

As the use of the corporate form proliferated in the 19th century, the question arose how to adapt the traditional rule about transitory actions for individuals to artificial persons created by law. Unsurprisingly, corporations did not relish the prospect of being haled into court for any claim anywhere they conducted business. "No one, after all, has ever liked greeting the process server." *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. ——, —— (2021) (GORSUCH, J., concurring in judgment). Corporations chartered in one State sought the right to send their sales agents and products freely into other States. At the same time, when confronted with lawsuits in those other States, some firms sought to hide behind their foreign character

and deny their presence to defeat the court's jurisdiction. *Ibid.*; see Brief for Petitioner 13–15; see also R. Jackson, What Price "Due Process"?, 5 N. Y. L. Rev. 435, 438 (1927) (describing this as the asserted right to "both be and not be").

Lawmakers across the country soon responded to these stratagems. Relevant here, both before and after the Fourteenth Amendment's ratification, they adopted statutes requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state corporations. These statutes varied. In some States, out-of-state corporate defendants were required to agree to answer suits brought by in-state plaintiffs. See, *e. g.*, N. Y. Code Proc. § 427 (1849); 1866 Wis. Laws ch. 1, § 86.1; Md. Ann. Code, Art. 26, § 211 (1868); N. C. Gen. Stat., ch. 17, § 82 (1873). In other States, corporations were required to consent to suit if the plaintiff's cause of action arose within the State, even if the plaintiff happened to reside elsewhere. See, *e. g.*, Iowa Code, ch. 101, § 1705 (1851); 1874 Tex. Gen. Laws p. 107; 1881 Mich. Pub. Acts p. 348. Still other States (and the federal government) omitted both of these limitations. They required all out-of-state corporations that registered to do business in the forum to agree to defend themselves there against any manner of suit. See, *e. g.*, Act of Feb. 22, 1867, 14 Stat. 404; 1889 Nev. Stats. p. 47; S. C. Rev. Stat., Tit. 7, ch. 45, § 1466 (1894); Conn. Gen. Stat. § 3931 (1895). Yet another group of States applied this all-purpose-jurisdiction rule to a subset of corporate defendants, like railroads and insurance companies. See, *e. g.*, 1827 Va. Acts ch. 74, p. 77; 1841 Pa. Laws p. 29; 1854 Ohio Laws p. 91; Ill. Comp. Stat., ch. 112, § 68 (1855); Ark. Stat., ch. 76, § 3561 (1873); Mo. Rev. Stat., ch. 119, Art. 4, § 6013 (1879). Mr. Mallory has collected an array of these statutes, enacted between 1835 and 1915, in

his statutory appendix. See App. to Brief for Petitioner 1a–274a.[4]

## III

### A

Unsurprisingly, some corporations challenged statutes like these on various grounds, due process included. And, ultimately, one of these disputes reached this Court in *Pennsylvania Fire*.

That case arose this way. Pennsylvania Fire was an insurance company incorporated under the laws of Pennsylvania. In 1909, the company executed a contract in Colorado to insure a smelter located near the town of Cripple Creek owned by the Gold Issue Mining & Milling Company, an Arizona corporation. *Gold Issue Min. & Milling Co.* v. *Penn-*

---

[4] Norfolk Southern and the dissent observe that *some* state courts applied these laws narrowly. Brief for Respondent 43–44; *post*, at 173–175, and n. 4 (BARRETT, J., dissenting). But, as we will see in a moment, *others* did not. Part III, *infra*. Even state courts that adopted narrowing constructions of their laws did so by invoking statutory interpretation principles and discretionary doctrines. Notably, neither Norfolk Southern nor the dissent has identified a *single* case (or any other source) from this period holding that all-purpose jurisdiction premised on a consent statute violates the Due Process Clause. Indeed, some of the decisions they cite presumed just the opposite. See, *e. g.*, *Camden Rolling Mill Co.* v. *Swede Iron Co.*, 32 N. J. L. 15, 17–18 (1866) (a law like Pennsylvania's "could be judicially adopted" consistent with due process if clearly expressed); *Sawyer* v. *North Am. Life Ins. Co.*, 46 Vt. 697, 706–707 (1874) (similar). Nothing in this body of case law, then, comes close to satisfying Norfolk Southern's burden of establishing that consent statutes like Pennsylvania's "'offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked'" among those secured by the Due Process Clause. *Medina* v. *California*, 505 U. S. 437, 445–448 (1992). In saying this much, we hardly suggest, as the dissent supposes, that the practice of States or their courts is irrelevant. *Post*, at 173, n. 3. Our point is simply that Norfolk Southern has not met *its burden* of showing that original and historic understandings of due process foreclose consent statutes.

*sylvania Fire Ins. Co. of Phila.*, 267 Mo. 524, 537, 184 S. W.
999, 1001 (1916). Less than a year later, lightning struck
and a fire destroyed the insured facility. *Ibid.* When Gold
Issue Mining sought to collect on its policy, Pennsylvania
Fire refused to pay. So, Gold Issue Mining sued. But it
did not sue where the contract was formed (Colorado), or in
its home State (Arizona), or even in the insurer's home State
(Pennsylvania). Instead, Gold Issue Mining brought its
claim in a Missouri state court. *Id.*, at 534, 184 S. W., at
1000. Pennsylvania Fire objected to this choice of forum.
It said the Due Process Clause spared it from having to an-
swer in Missouri's courts a suit with no connection to the
State. *Id.*, at 541, 184 S. W., at 1002.

The Missouri Supreme Court disagreed. It first observed
that Missouri law required any out-of-state insurance com-
pany "desiring to transact any business" in the State to file
paperwork agreeing to (1) appoint a state official to serve as
the company's agent for service of process, and (2) accept
service on that official as valid in any suit. *Id.*, at 543, 184
S. W., at 1003 (internal quotation marks omitted). For more
than a decade, Pennsylvania Fire had complied with the law,
as it had "desir[ed] to transact business" in Missouri "pursu-
ant to the laws thereof." *Id.*, at 545, 184 S. W., at 1003.
And Gold Issue Mining had served process on the appro-
priate state official, just as the law required. See *id.*, at 535,
184 S. W., at 1000.

As to the law's constitutionality, the Missouri Supreme
Court carefully reviewed this Court's precedents and found
they "clearly" supported "sustain[ing] the proceeding." *Id.*,
at 569, 576, 184 S. W., at 1010, 1013; see *id.*, at 552–576, 601,
184 S. W., at 1005–1013, 1020–1021. The Missouri Supreme
Court explained that its decision was also supported by "the
origin, growth, and history of transitory actions in England,
and their importation, adoption, and expansion" in America.
*Id.*, at 578–586, 184 S. W., at 1013–1016. It stressed, too,

that the law had long permitted suits against individuals in any jurisdiction where they could be found, no matter where the underlying cause of action happened to arise. What sense would it make to treat a fictitious corporate person differently? See *id.*, at 588–592, 600, 184 S. W., at 1016–1018, 1020. For all these reasons, the court concluded, Pennsylvania Fire "ha[d] due process of law, regardless of the place, state or nation where the cause of action arose." *Id.*, at 576, 184 S. W., at 1013.

Dissatisfied with this answer, Pennsylvania Fire turned here. Writing for a unanimous Court, Justice Holmes had little trouble dispatching the company's due process argument. Under this Court's precedents, there was "no doubt" Pennsylvania Fire could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract because it had agreed to accept service of process in Missouri on any suit as a condition of doing business there. *Pennsylvania Fire*, 243 U. S., at 95. Indeed, the Court thought the matter so settled by existing law that the case "hardly" presented an "open" question. *Ibid.* The Court acknowledged that the outcome might have been different if the corporation had never appointed an agent for service of process in Missouri, given this Court's earlier decision in *Old Wayne Mut. Life Assn. of Indianapolis* v. *McDonough*, 204 U. S. 8 (1907). But the Court thought that *Old Wayne* had "left untouched" the principle that due process allows a corporation to be sued on any claim in a State where it has appointed an agent to receive whatever suits may come. 243 U. S., at 95–96. The Court found it unnecessary to say more because the company's objections had been resolved "at length in the judgment of the court below." *Id.*, at 95.

That assessment was understandable. Not only had the Missouri Supreme Court issued a thoughtful opinion. Not only did a similar rule apply to transitory actions against individuals. Other leading judges, including Learned Hand

and Benjamin Cardozo, had reached similar conclusions in similar cases in the years leading up to *Pennsylvania Fire.* See *Smolik* v. *Philadelphia & Reading Coal & Iron Co.,* 222 F. 148, 150–151 (SDNY 1915) (Hand, J.); *Bagdon* v. *Philadelphia & Reading Coal & Iron Co.,* 217 N. Y. 432, 436–437, 111 N. E. 1075, 1076–1077 (1916) (Cardozo, J.). In the years following *Pennsylvania Fire,* too, this Court reaffirmed its holding as often as the issue arose. See, *e. g., Louisville & Nashville R. Co.* v. *Chatters,* 279 U. S. 320, 325–326 (1929); *Neirbo Co.* v. *Bethlehem Shipbuilding Corp.,* 308 U. S. 165, 175 (1939); see also *Robert Mitchell Furniture Co.* v. *Selden Breck Constr. Co.,* 257 U. S. 213, 215–216 (1921); *Wuchter* v. *Pizzutti,* 276 U. S. 13, 20 (1928).

B

*Pennsylvania Fire* controls this case. Much like the Missouri law at issue there, the Pennsylvania law at issue here provides that an out-of-state corporation "may not do business in this Commonwealth until it registers with" the Department of State. 15 Pa. Cons. Stat. § 411(a). As part of the registration process, a corporation must identify an "office" it will "continuously maintain" in the Commonwealth. § 411(f); see also § 412(a)(5). Upon completing these requirements, the corporation "shall enjoy the same rights and privileges as a domestic entity and shall be subject to the same liabilities, restrictions, duties and penalties . . . imposed on domestic entities." § 402(d). Among other things, Pennsylvania law is explicit that "qualification as a foreign corporation" shall permit state courts to "exercise general personal jurisdiction" over a registered foreign corporation, just as they can over domestic corporations. 42 Pa. Cons. Stat. § 5301(a)(2)(i).

Norfolk Southern has complied with this law for many years. In 1998, the company registered to do business in Pennsylvania. Acting through its Corporate Secretary as a

"duly authorized officer," the company completed an "Application for Certificate of Authority" from the Commonwealth "[i]n compliance with" state law. App. 1–2. As part of that process, the company named a "Commercial Registered Office Provider" in Philadelphia County, agreeing that this was where it "shall be deemed . . . located." *Ibid.* The Secretary of the Commonwealth approved the application, conferring on Norfolk Southern both the benefits and burdens shared by domestic corporations—including amenability to suit in state court on any claim. *Id.,* at 1. Since 1998, Norfolk Southern has regularly updated its information on file with the Secretary. In 2009, for example, the company advised that it had changed its Registered Office Provider and would now be deemed located in Dauphin County. *Id.,* at 6; see 15 Pa. Cons. Stat. § 4144(b) (1988). All told, then, Norfolk Southern has agreed to be found in Pennsylvania and answer any suit there for more than 20 years.

*Pennsylvania Fire* held that suits premised on these grounds do not deny a defendant due process of law. Even Norfolk Southern does not seriously dispute that much. It concedes that it registered to do business in Pennsylvania, that it established an office there to receive service of process, and that in doing so it understood it would be amenable to suit on any claim. Tr. of Oral Arg. 62; *post,* at 150–151 (ALITO, J., concurring in part and concurring in judgment); *post,* at 148 (JACKSON, J., concurring). Of course, Mr. Mallory no longer lives in Pennsylvania and his cause of action did not accrue there. But none of that makes any more difference than the fact that Gold Issue Mining was not from Missouri (but from Arizona) and its claim did not arise there (but in Colorado). See *Pennsylvania Fire,* 267 Mo., at 537, 184 S. W., at 1001. To decide this case, we need not speculate whether any other statutory scheme and set of facts would suffice to establish consent to suit. It is enough to

acknowledge that the state law and facts before us fall squarely within *Pennsylvania Fire*'s rule. See *post*, at 150–153 (opinion of ALITO, J.).

In the proceedings below, the Pennsylvania Supreme Court seemed to recognize that *Pennsylvania Fire* dictated an answer in Mr. Mallory's favor. Still, it ruled for Norfolk Southern anyway. It did so because, in its view, intervening decisions from this Court had "implicitly overruled" *Pennsylvania Fire*. See 266 A. 3d, at 559, 567. But in following that course, the Pennsylvania Supreme Court clearly erred. As this Court has explained: "If a precedent of this Court has direct application in a case," as *Pennsylvania Fire* does here, a lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989). This is true even if the lower court thinks the precedent is in tension with "some other line of decisions." *Ibid.*[5]

IV

Now before us, Norfolk Southern candidly asks us to do what the Pennsylvania Supreme Court could not—overrule

---

[5] The dissent stresses that Pennsylvania's statute does not use the word "consent" in describing the jurisdictional consequences of registration. When the dissent finally comes around to addressing *Pennsylvania Fire* at the end of its opinion, it fleetingly seeks to distinguish the decision along the same lines—stressing that words like "agent" and "jurisdiction" do not appear "in Norfolk Southern's registration paperwork." *Post*, at 167, 179, and n. 8. But, as the dissent itself elsewhere acknowledges, "'[a] variety of legal arrangements have been taken to represent express or implied consent to'" personal jurisdiction consistent with due process. *Post*, at 167. And neither *Pennsylvania Fire*, nor our later decisions applying it, nor our precedents approving other forms of consent to personal jurisdiction have ever imposed some sort of "magic words" requirement. See *infra*, at 145–146; *Pennsylvania Fire*, 243 U. S., at 95; *Neirbo Co.*, 308 U. S., at 175.

*Pennsylvania Fire*.   Brief for Respondent 36–38.   To smooth the way, Norfolk Southern suggests that this Court's decision in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), has already done much of the hard work for us. That decision, the company insists, seriously undermined *Pennsylvania Fire*'s foundations.   Brief for Respondent 34–36.   We disagree.   The two precedents sit comfortably side by side.   See *post*, at 152–153 (opinion of ALITO, J.).

### A

Start with how Norfolk Southern sees things.   On the company's telling, echoed by the dissent, *International Shoe* held that the Due Process Clause tolerates two (and only two) types of personal jurisdiction over a corporate defendant.   First, "specific jurisdiction" permits suits that " 'arise out of or relate to' " a corporate defendant's activities in the forum State.   *Ford Motor Co.*, 592 U. S., at ⸺ – ⸺.   Second, "general jurisdiction" allows all kinds of suits against a corporation, but only in States where the corporation is incorporated or has its "principal place of business."   *Id.*, at ⸺.   After *International Shoe*, Norfolk Southern insists, no other bases for personal jurisdiction over a corporate defendant are permissible.   Brief for Respondent 13–15; see *post*, at 164–166 (BARRETT, J., dissenting).

But if this account might seem a plausible summary of some of our *International Shoe* jurisprudence, it oversimplifies matters.   Here is what really happened in *International Shoe*.   The State of Washington sued a corporate defendant in state court for claims based on its in-state activities even though the defendant had *not* registered to do business in Washington and had *not* agreed to be present and accept service of process there.   326 U. S., at 312–313. Despite this, the Court held that the suit against the company comported with due process.   In doing so, the Court reasoned that the Fourteenth Amendment "permit[s]" suits

against a corporate defendant that has not agreed to be "presen[t] within the territorial jurisdiction of a court," so long as "the quality and nature of the [company's] activity" in the State "make it reasonable and just" to maintain suit there. *Id.*, at 316, 319–320. Put simply, even without agreeing to be present, the out-of-state corporation was still amenable to suit in Washington consistent with "'fair play and substantial justice'"—terms the Court borrowed from Justice Holmes, the author of *Pennsylvania Fire*. *International Shoe*, 326 U. S., at 316 (citing *McDonald* v. *Mabee*, 243 U. S. 90, 91–92 (1917)).

In reality, then, all *International Shoe* did was stake out an *additional* road to jurisdiction over out-of-state corporations. *Pennsylvania Fire* held that an out-of-state corporation that *has* consented to in-state suits in order to do business in the forum is susceptible to suit there. *International Shoe* held that an out-of-state corporation that *has not* consented to in-state suits may also be susceptible to claims in the forum State based on "the quality and nature of [its] activity" in the forum. 326 U. S., at 319. Consistent with all this, our precedents applying *International Shoe* have long spoken of the decision as asking whether a state court may exercise jurisdiction over a corporate defendant "'that *has not consented* to suit in the forum.'" *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 927–928 (2011) (emphasis added); see also *Daimler AG* v. *Bauman*, 571 U. S. 117, 129 (2014). Our precedents have recognized, too, that "express or implied consent" can continue to ground personal jurisdiction—and consent may be manifested in various ways by word or deed. See, *e. g., Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703 (1982); *BNSF R. Co.* v. *Tyrrell*, 581 U. S. 402, 415 (2017). See also *post*, at 152–153 (opinion of ALITO, J.).[6]

────────

[6] Because *International Shoe* allowed a suit against a corporation that had *not* registered to do business in the forum State, if it disturbed anything it was only this Court's decision in *Old Wayne*, not *Pennsylvania*

That Norfolk Southern overreads *International Shoe* finds confirmation in that decision's emphasis on "'fair play and substantial justice.'" 326 U. S., at 316. Sometimes, *International Shoe* said, the nature of a company's in-state activities will support jurisdiction over a nonconsenting corporation when those activities "give rise to the liabilities sued on." *Id.*, at 317. Other times, it added, suits "on causes of action arising from dealings entirely distinct from [the company's] activities" in the forum State may be appropriate. *Id.*, at 318. These passages may have pointed the way to what (much) later cases would label "specific jurisdiction" over claims related to in-forum activities and "general jurisdiction" in places where a corporation is incorporated or headquartered. See, *e. g.*, *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 414–415, and nn. 8–9 (1984). But the fact remains that *International Shoe* itself eschewed any "mechanical or quantitative" test and instead endorsed a flexible approach focused on "the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." 326 U. S., at 319. Unquestionably, too, *International Shoe* saw this flexible standard as expanding—not contracting—state court jurisdiction. See *Daimler*, 571 U. S., at 128, and n. 6. As we later put the point: "The immediate effect of [*International Shoe*] was to increase the ability of the state courts to obtain personal jurisdiction over nonresident defendants." *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977).

Given all this, it is no wonder that we have already turned aside arguments very much like Norfolk Southern's. In *Burnham*, the defendant contended that *International Shoe* implicitly overruled the traditional tag rule holding that individuals physically served in a State are subject to suit there for claims of any kind. 495 U. S., at 616 (plurality opinion).

---

*Fire*. See *supra*, at 133; *Perkins* v. *Benguet Consol. Mining Co.*, 342 U. S. 437, 443–444 (1952).

This Court rejected that submission. Instead, as Justice Scalia explained, *International Shoe* simply provided a "novel" way to secure personal jurisdiction that did nothing to displace other "traditional ones." *Id.*, at 619. What held true there must hold true here. Indeed, seven years *after* deciding *International Shoe*, the Court cited *Pennsylvania Fire* approvingly. *Perkins* v. *Benguet Consol. Mining Co.*, 342 U. S. 437, 446, n. 6 (1952).[7]

B

Norfolk Southern offers several replies, but none persuades. The company begins by pointing to this Court's decision in *Shaffer*. There, as the company stresses, the Court indicated that "'prior decisions . . . inconsistent with'" *International Shoe* "'are overruled.'" Brief for Respondent 35 (quoting *Shaffer*, 433 U. S., at 212, n. 39); *post*, at 177–178 (opinion of BARRETT, J.). True as that statement may be, however, it only poses the question whether *Pennsylvania Fire* is "inconsistent with" *International Shoe*. And, as we have seen, it is not. Instead, the latter decision expanded upon the traditional grounds of personal jurisdiction recog-

---

[7] Norfolk Southern and the dissent observe that, today, few States continue to employ consent statutes like Pennsylvania's. Brief for Respondent 22; *post*, at 172–173, 177, n. 6. Surely, too, some States may see strong policy reasons for proceeding differently than Pennsylvania has. See, *e. g.*, *State ex rel. Am. Central Life Ins. Co.* v. *Landwehr*, 300 S. W. 294, 297 (1927) (abandoning construction of Missouri law at issue in *Pennsylvania Fire* based on "the legislative policy in th[e] state"); cf. *Cooper Tire*, 312 Ga., at 437, 863 S. E. 2d, at 92 (Bethel, J., concurring) (suggesting Georgia's consent scheme "creates a disincentive for foreign corporations to" do business in-state and conflicts with the State's claim to be "'business-friendly'"). But the meaning of the Due Process Clause is not measured by the latest popularity poll, nor does it come with some desuetude rule against a traditional practice like consent-based jurisdiction long held consistent with its demands. See *Ownbey* v. *Morgan*, 256 U. S. 94, 110–111 (1921).

nized by the former. This Court has previously cautioned litigants and lower courts against (mis)reading *Shaffer* as suggesting that *International Shoe* discarded every traditional method for securing personal jurisdiction that came before. See *Burnham*, 495 U. S., at 620–622 (plurality opinion); cf. *Daimler*, 571 U. S., at 126, 132–133. We find ourselves repeating the admonition today.[8]

Next, Norfolk Southern appeals to the spirit of our age. After *International Shoe*, it says, the "primary concern" of the personal jurisdiction analysis is "[t]reating defendants fairly." Brief for Respondent 19 (internal quotation marks omitted). And on the company's telling, it would be "unfair" to allow Mr. Mallory's suit to proceed in Pennsylvania because doing so would risk unleashing " 'local prejudice' " against a company that is "not 'local' in the eyes of the community." *Id.*, at 19–21.

But if fairness is what Norfolk Southern seeks, pause for a moment to measure this suit against that standard. When Mr. Mallory brought his claim in 2017, Norfolk Southern had registered to do business in Pennsylvania for many years. It had established an office for receiving service of process. It had done so pursuant to a statute that gave the company the right to do business in-state in return for agreeing to answer any suit against it. And the company had taken full advantage of its opportunity to do business in the Commonwealth, boasting of its presence this way:

---

[8] Taking up the *Shaffer* baton from the company, the dissent insists that *International Shoe* " 'cast . . . aside' " consent statutes in favor of a minimum contacts analysis. *Post*, at 175–176. But, as we have seen, nothing in *International Shoe* purported to address, let alone condemn, consent statutes. Even the dissent ultimately acknowledges, as it must, that " 'a variety of legal arrangements' " can signal consent to jurisdiction after *International Shoe*, and these arrangements *can* include state laws requiring consent to suit in exchange "for access to [a State's] markets." *Post*, at 167, 168; see also *Neirbo Co.*, 308 U. S., at 175 (calling this form of consent "*real* consent" (emphasis added)).



Page Proof Pending Publication

Norfolk Southern Corp., State Fact Sheets–Pennsylvania (2018), https://nscorp.com/content/dam/nscorp/get-to-know-ns/about-ns/state-fact-sheets/pa-state-fact-sheet.pdf.

All told, when Mr. Mallory sued, Norfolk Southern employed nearly 5,000 people in Pennsylvania. It maintained more than 2,400 miles of track across the Commonwealth. Its 70-acre locomotive shop there was the largest in North America. Contrary to what it says in its brief here, the company even proclaimed itself a proud part of "the Pennsylvania Community." *Ibid.* By 2020, too, Norfolk Southern managed more miles of track in Pennsylvania than in any other State. Brief for Public Citizen as *Amicus Curiae* 21. And it employed more people in Pennsylvania than it did in Virginia, where its headquarters was located. *Ibid.* Nor are we conjuring these statistics out of thin air. The company *itself* highlighted its "intrastate activities" in the proceedings below. 266 A. 3d, at 560, 563 (discussing the firm's "extensive operations in Pennsylvania," including "2,278 miles of track," "eleven rail yards," and "three locomotive repair shops"). Given all this, on what plausible account could *International Shoe*'s concerns with "fair play and substantial justice" require a Pennsylvania court to turn aside Mr. Mallory's suit? See *post*, at 153–154 (opinion of ALITO, J.).[9]

---

[9] The dissent does not dispute the company's extensive in-state contacts but replies that counsel for Mr. Mallory abandoned any reliance on them at oral argument. *Post*, at 179–180, and n. 9. In support of its claim, however, the dissent shears from context two sentences counsel uttered in response to a question about "why [Mr. Mallory] sue[d] in Philadelphia." Tr. of Oral Arg. 48. In reply, counsel explained that Mr. Mallory "used to live . . . in Pennsylvania" and "his lawyers are from there." *Id.*, at 48–49. Counsel then agreed that "*[t]hose* contacts" would not establish jurisdiction and pointed this Court to Norfolk Southern's "consent" to suit in Pennsylvania. *Id.*, at 49 (emphasis added). All in all, it was a prosaic response to a simple question about why Mr. Mallory filed suit where he did. Nor, contrary to the dissent's suggestion, are we alone in discussing the company's in-state contacts; the lower court, the company, *and* the dissent all point to them too. See 266 A. 3d, at 547; Brief for Respondent 16–21; *post*, at 165–166.

Perhaps sensing its arguments from fairness meet a dead end, Norfolk Southern ultimately heads in another direction altogether. It suggests the Due Process Clause separately prohibits one State from infringing on the sovereignty of another State through exorbitant claims of personal jurisdiction. Brief for Respondent 16–19; see *post*, at 168–171 (opinion of BARRETT, J.). And, in candor, the company is half right. Some of our personal jurisdiction cases have discussed the federalism implications of one State's assertion of jurisdiction over the corporate residents of another. See, *e. g.*, *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 263 (2017). But that neglects an important part of the story. To date, our personal jurisdiction cases have never found a Due Process Clause problem sounding in federalism when an out-of-state defendant submits to suit in the forum State. After all, personal jurisdiction is a *personal* defense that may be waived or forfeited. See *Insurance Corp. of Ireland*, 456 U. S., at 704–705; see also *post*, at 156 (opinion of ALITO, J.); *post*, at 147–148 (opinion of JACKSON, J.).

That leaves Norfolk Southern one final stand. It argues that it has not *really* submitted to proceedings in Pennsylvania. Brief for Respondent 11–13; see *post*, at 167–168, 170 (opinion of BARRETT, J.). The company does not dispute that it has filed paperwork with Pennsylvania seeking the right to do business there. It does not dispute that it has established an office in the Commonwealth to receive service of process on any claim. It does not dispute that it appreciated the jurisdictional consequences attending these actions and proceeded anyway, presumably because it thought the benefits outweighed the costs. But, in the name of the Due Process Clause, Norfolk Southern insists we should dismiss all that as a raft of meaningless formalities.[10]

---

[10] While the dissent joins Norfolk Southern in this argument, it wavers. At points, the dissent seems to insist that laws like Pennsylvania's "mak[e] no sense." *Post*, at 167–168. But the closest the dissent comes to identifying authority for the notion that laws like these are impermissible are

Taken seriously, this argument would have us undo not just *Pennsylvania Fire* but a legion of precedents that attach jurisdictional consequences to what some might dismiss as mere formalities. Consider some examples we have already encountered. In a typical general jurisdiction case under *International Shoe*, a company is subject to suit on any claim in a forum State only because of its decision to file a piece of paper there (a certificate of incorporation). The firm is amenable to suit even if all of its operations are located elsewhere and even if its certificate only sits collecting dust on an office shelf for years thereafter. See, *e. g.*, *Goodyear*, 564 U. S., at 924. Then there is the tag rule. The invisible state line might seem a trivial thing. But when an individual takes one step off a plane after flying from New Jersey to California, the jurisdictional consequences are immediate and serious. See *Burnham*, 495 U. S., at 619 (plurality opinion).

Consider, too, just a few other examples. A defendant who appears "specially" to contest jurisdiction preserves his defense, but one who forgets can lose his. See *York* v. *Texas*, 137 U. S. 15, 19–21 (1890). Failing to comply with certain pretrial court orders, signing a contract with a forum selection clause, accepting an in-state benefit with jurisdictional strings attached—all these actions as well can carry with them profound consequences for personal jurisdiction. See *Insurance Corp. of Ireland*, 456 U. S., at 703–706 (collecting cases); see also *post*, at 147–148 (opinion of JACKSON, J.).

two cases that did not involve personal jurisdiction or purport to interpret the Due Process Clause. *Post*, at 170 (citing *Home Ins. Co.* v. *Morse*, 20 Wall. 445 (1874); *Barron* v. *Burnside*, 121 U. S. 186 (1887)). The dissent's observation that one of those cases in turn cited *Lafayette Ins. Co.* v. *French*, 18 How. 404 (1856), hardly helps—that decision *approved* a consent-to-suit regime for out-of-state corporations under the Full Faith and Credit Clause. *Id.*, at 405–407. At other points, however, and as we have seen, the dissent rightly acknowledges that a "'variety of legal arrangements [may] represent express or implied consent'" to personal jurisdiction consistent with due process, and these arrangements can include requiring at least some companies to consent to suit in exchange "for access to [a State's] markets." *Post*, at 167, 168.

The truth is, under our precedents a variety of "actions of the defendant" that may seem like technicalities nonetheless can "amount to a legal submission to the jurisdiction of a court." *Insurance Corp. of Ireland*, 456 U. S., at 704–705; see also Brief for Stephen E. Sachs as *Amicus Curiae* 10. That was so before *International Shoe*, and it remains so today. Should we overrule them all? Taking Norfolk Southern's argument seriously would require just that. But, tellingly, the company does not follow where its argument leads or even acknowledge its implications. Instead, Norfolk Southern asks us to pluck out and overrule just one longstanding precedent that it happens to dislike. We decline the invitation. *Post*, at 152–153 (opinion of ALITO, J.). There is no fair play or substantial justice in that.[11]

\* \* \*

Not every case poses a new question. This case poses a very old question indeed—one this Court resolved more than a century ago in *Pennsylvania Fire*. Because that decision remains the law, the judgment of the Supreme Court of Pennsylvania is vacated, and the case is remanded.

*It is so ordered.*

---

[11] While various separate writings accompany this opinion, it should be apparent a majority of the Court today agrees that: Norfolk Southern consented to suit in Pennsylvania. *Supra*, at 134–136; *post*, at 151 (opinion of ALITO, J.). *Pennsylvania Fire* therefore controls this case. *Supra*, at 135–136; *post*, at 151–152 (opinion of ALITO, J.). *Pennsylvania Fire*'s rule for consent-based jurisdiction has not been overruled. *Supra*, at 136–138; *post*, at 152–153 (opinion of ALITO, J.). *International Shoe* governs where a defendant has not consented to exercise of jurisdiction. *Supra*, at 138; *post*, at 152–153 (opinion of ALITO, J.). Exercising jurisdiction here is hardly unfair. *Supra*, at 141–143; *post*, at 153–154 (opinion of ALITO, J.). The federalism concerns in our due process cases have applied only when a defendant has not consented. *Supra*, at 144; *post*, at 156 (opinion of ALITO, J.). Nor will this Court now overrule *Pennsylvania Fire*. *Supra*, at 144–146; *post*, at 152 (opinion of ALITO, J.).

JUSTICE JACKSON, concurring.

I agree with the Court that this case is straightforward under our precedents. I write separately to say that, for me, what makes it so is not just our ruling in *Pennsylvania Fire Ins. Co. of Philadelphia* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93 (1917). I also consider our ruling in *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694 (1982), to be particularly instructive.

In *Insurance Corp. of Ireland*, this Court confirmed a simple truth: The due process "requirement of personal jurisdiction" is an individual, waivable right. *Id.*, at 703. The requirement exists, we said, to ensure that the forum State has sufficient contacts with a defendant, such that " 'the maintenance of the suit [does] not offend "traditional notions of fair play and substantial justice." ' " *Ibid.* (quoting *International Shoe Co.* v. *Washington*, 326 U. S. 310, 319 (1945)). We noted further that the interstate federalism concerns informing that right are "ultimately a function of the individual liberty interest" that this due process right preserves. 456 U. S., at 703, n. 10. Because the personal-jurisdiction right belongs to the defendant, however, we explained that a defendant can choose to "subject [itself] to powers from which [it] may otherwise be protected." *Ibid.* When that happens, a State can exercise jurisdiction over the defendant consistent with the Due Process Clause, even if our personal-jurisdiction cases would normally preclude the State from subjecting a defendant to its authority under the circumstances presented. *Ibid.*

Waiver is thus a critical feature of the personal-jurisdiction analysis. And there is more than one way to waive personal-jurisdiction rights, as *Insurance Corp. of Ireland* also clarified. A defendant can waive its rights by explicitly or implicitly consenting to litigate future disputes in a particular State's courts. *Id.*, at 703–704. A defendant might also fail to follow specific procedural rules, and end up waiving the right to object to personal jurisdiction as a

consequence. *Id.*, at 705–706. Or a defendant can voluntarily invoke certain benefits from a State that are conditioned on submitting to the State's jurisdiction. *Id.*, at 704 (citing *Adam* v. *Saenger*, 303 U. S. 59, 67–68 (1938)).

Regardless of whether a defendant relinquishes its personal-jurisdiction rights expressly or constructively, the basic teaching of *Insurance Corp. of Ireland* is the same: When a defendant chooses to engage in behavior that "amount[s] to a legal submission to the jurisdiction of the court," the Due Process Clause poses no barrier to the court's exercise of personal jurisdiction. 456 U. S., at 704–705.

In my view, there is no question that Norfolk Southern waived its personal-jurisdiction rights here. As the Court ably explains, Norfolk Southern agreed to register as a foreign corporation in Pennsylvania in exchange for the ability to conduct business within the Commonwealth and receive associated benefits. *Ante*, at 134–135; see also *post*, at 151 (ALITO, J., concurring in part and concurring in judgment). Moreover, when Norfolk Southern made that decision, the jurisdictional consequences of registration were clear. See 42 Pa. Cons. Stat. §5301(a)(2)(i) (1981) (expressly linking "qualification as a foreign corporation under the laws of th[e] Commonwealth" to the "exercise [of] general personal jurisdiction"); 266 A. 3d 542, 569 (Pa. 2021) (acknowledging that "foreign corporations are given reasonable notice" of the jurisdictional implications of registration).

Nor was Norfolk Southern compelled to register and submit itself to the general jurisdiction of Pennsylvania courts simply because its trains passed through the Commonwealth. See, *e. g.*, 15 Pa. Cons. Stat. §403(a)(11) (2014); 1972 Pa. Laws pp. 1154–1155. Registration is required when corporations seek to conduct *local* business in a "regular, systematic, or extensive" way. 266 A. 3d, at 562–563 (internal quotation marks omitted). Norfolk Southern apparently deemed registration worthwhile and opted in.

JACKSON, J., concurring

Under *Insurance Corp. of Ireland*, the due process question that this case presents is easily answered. Having made the choice to register and do business in Pennsylvania despite the jurisdictional consequences (and having thereby voluntarily relinquished the due process rights our general-jurisdiction precedents afford), Norfolk Southern cannot be heard to complain that its due process rights are violated by having to defend itself in Pennsylvania's courts. Whether Pennsylvania could have asserted general jurisdiction over Norfolk Southern *absent* any waiver, see *post*, at 165–166 (BARRETT, J., dissenting), is beside the point.

In other areas of the law, we permit States to ask defendants to waive individual rights and safeguards. See, *e. g.*, *Brady* v. *United States*, 397 U. S. 742, 748 (1970) (allowing plea bargains to waive a defendant's trial rights and the right against self-incrimination); *Barker* v. *Wingo*, 407 U. S. 514, 529, 536 (1972) (waiver of speedy trial rights). Moreover, when defendants do so, we respect that waiver decision and hold them to that choice, even though the government could not have otherwise bypassed the rules and procedures those rights protect. Insisting that our general-jurisdiction precedents preclude Pennsylvania from subjecting corporations to suit within its borders—despite their waiver of the protections those precedents entail—puts the personal-jurisdiction requirement on a pedestal. But there is nothing "unique about the requirement of personal jurisdiction [that] prevents it from being . . . waived like other [individual] rights." *Insurance Corp. of Ireland*, 456 U. S., at 706.

In short, *Insurance Corp. of Ireland* makes clear that the personal-jurisdiction requirement is an individual, waivable right, and I agree with the Court that Norfolk Southern waived that right by choosing to register as a foreign corporation under the circumstances presented in this case. Therefore, I perceive no due process problem with the registration statute at issue here.

JUSTICE ALITO, concurring in part and concurring in the judgment.

The sole question before us is whether the Due Process Clause of the Fourteenth Amendment is violated when a large out-of-state corporation with substantial operations in a State complies with a registration requirement that conditions the right to do business in that State on the registrant's submission to personal jurisdiction in any suits that are brought there. I agree with the Court that the answer to this question is no. *Assuming* that the Constitution allows a State to impose such a registration requirement, I see no reason to conclude that such suits violate the corporation's right to " 'fair play and substantial justice.' " *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316 (1945).

I am not convinced, however, that the Constitution permits a State to impose such a submission-to-jurisdiction requirement. A State's assertion of jurisdiction over lawsuits with no real connection to the State may violate fundamental principles that are protected by one or more constitutional provisions or by the very structure of the federal system that the Constitution created. At this point in the development of our constitutional case law, the most appropriate home for these principles is the so-called dormant Commerce Clause. Norfolk Southern appears to have asserted a Commerce Clause claim below, but the Pennsylvania Supreme Court did not address it. See 266 A. 3d 542, 559–560, nn. 9, 11 (2021). Presumably, Norfolk Southern can renew the challenge on remand. I therefore agree that we should vacate the Pennsylvania Supreme Court's judgment and remand the case for further proceedings.

I

When Virginia resident Robert Mallory initiated this suit, Norfolk Southern Railway Company, a railroad that was at that time incorporated and headquartered in Virginia, had long operated rail lines and conducted related business in

Pennsylvania. Consistent with Pennsylvania law, the company had registered as a "foreign" corporation, most recently in 1998. 15 Pa. Cons. Stat. §411(a) (2014); App. 1–2. Then, as now, Pennsylvania law expressly provided that "qualification as a foreign corporation" was a "sufficient basis" for Pennsylvania courts "to exercise general personal jurisdiction" over an out-of-state company. 42 Pa. Cons. Stat. §5301(a)(2)(i) (2019). Norfolk Southern is a sophisticated entity, and we may "presum[e]" that it "acted with knowledge" of state law when it registered. *Commercial Mut. Accident Co.* v. *Davis*, 213 U. S. 245, 254 (1909). As a result, we may also presume that by registering, it consented to all valid conditions imposed by state law.

I do not understand Norfolk Southern to challenge this basic premise. Tr. of Oral Arg. 62 (acknowledging that "the railroad understood by filing [registration paperwork] that it was subject to [Pennsylvania's general jurisdiction] law"). Instead, Norfolk Southern argues that giving force to the company's consent would violate the Fourteenth Amendment's Due Process Clause. See *Power Mfg. Co.* v. *Saunders*, 274 U. S. 490, 496–497 (1927).

That argument is foreclosed by our precedent. We addressed this question more than a century ago in *Pennsylvania Fire Ins. Co. of Philadelphia* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93 (1917). There, an Arizona mining company sued a Pennsylvania insurance company in a Missouri court, alleging claims arising from events in Colorado. *Id.*, at 94. The Pennsylvania insurance company had "obtained a license to do business in Missouri," and so had complied with a Missouri statute requiring the company to execute a power of attorney consenting to service of process on the state insurance superintendent in exchange for licensure. *Ibid.* The Missouri Supreme Court had previously construed such powers of attorney as consent to jurisdiction in Missouri for all claims, including those arising from transactions outside the State. *Gold Issue Mining & Milling Co.*

v. *Pennsylvania Fire Ins. Co. of Philadelphia*, 267 Mo. 524, 549–550, 184 S. W. 999, 1003–1005 (1916) (citing *State ex rel. Pacific Mut. Life Ins. Co.* v. *Grimm*, 239 Mo. 135, 159–171, 143 S. W. 483, 490–494 (1911)).   Because the insurance company had executed the power of attorney to obtain its license, the court held that Missouri had jurisdiction over the company in that suit.   267 Mo., at 610, 184 S. W., at 1024. We affirmed in a brief opinion, holding that the construction of Missouri's statute and its application to the Pennsylvania insurance company under the circumstances of the case did not violate due process.   *Pennsylvania Fire*, 243 U. S., at 95.

The parallels between *Pennsylvania Fire* and the case before us are undeniable.   In both, a large company incorporated in one State was actively engaged in business in another State.   In connection with that business, both companies took steps that, under the express terms or previous authoritative construction of state law, were understood as consent to the State's jurisdiction in suits on all claims, no matter where the events underlying the suit took place.   In both cases, an out-of-state plaintiff sued the out-of-state company, alleging claims unrelated to the company's forum-state conduct.   And in both, the out-of-state company objected, arguing that holding it to the terms of its consent would violate the Fourteenth Amendment's Due Process Clause. In *Pennsylvania Fire*, we held that there was no due process violation in these circumstances.   Given the near-complete overlap of material facts, that holding, unless it has been overruled, is binding here.

Norfolk Southern has not persuaded me that *Pennsylvania Fire* has been overruled.   While we have infrequently invoked that decision's due process holding, we have never expressly overruled it.   Nor can I conclude that it has been impliedly overruled.   See *post*, at 177–178 (BARRETT, J., dissenting).   Norfolk Southern cites the *International Shoe* line of cases, but those cases involve constitutional limits on jurisdiction over *non-consenting* corporations.   See *Inter-*

*national Shoe*, 326 U. S., at 317; *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 927–928 (2011); *Daimler AG* v. *Bauman*, 571 U. S. 117, 129 (2014); *BNSF R. Co.* v. *Tyrrell*, 581 U. S. 402, 415 (2017) (declining to consider defendant's alleged consent because court below did not reach it). Consent is a separate basis for personal jurisdiction. *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703 (1982); *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 472, n. 14 (1985); *J. McIntyre Machinery, Ltd.* v. *Nicastro*, 564 U. S. 873, 880–881 (2011) (plurality opinion). *Pennsylvania Fire*'s holding, insofar as it is predicated on the out-of-state company's consent, is not "inconsistent" with *International Shoe* or its progeny. *Shaffer* v. *Heitner*, 433 U. S. 186, 212, n. 39 (1977).

Nor would I overrule *Pennsylvania Fire* in this case, as Norfolk Southern requests. At the least, *Pennsylvania Fire*'s holding does not strike me as "egregiously wrong" in its application here. *Ramos* v. *Louisiana*, 590 U. S. ——, —— (2020) (KAVANAUGH, J., concurring in part). Requiring Norfolk Southern to defend against Mallory's suit in Pennsylvania, as opposed to in Virginia, is not so deeply unfair that it violates the railroad's constitutional right to due process. *International Shoe*, 326 U. S., at 316. The company has extensive operations in Pennsylvania, 266 A. 3d, at 562–563; see also *ante*, at 141–143; has availed itself of the Pennsylvania courts on countless occasions, Brief for Academy of Rail Labor Attorneys as *Amicus Curiae* 4–5 (collecting cases); and had clear notice that Pennsylvania considered its registration as consent to general jurisdiction, 15 Pa. Cons. Stat. § 411(a); 42 Pa. Cons. Stat. § 5301(a)(2)(i). Norfolk Southern's "conduct and connection with [Pennsylvania] are such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 297 (1980).

If having to defend this suit in Pennsylvania seems unfair to Norfolk Southern, it is only because it is hard to see Mal-

lory's decision to sue in Philadelphia as anything other than the selection of a venue that is reputed to be especially favorable to tort plaintiffs.[1]   But we have never held that the Due Process Clause protects against forum shopping.   Perhaps for that understandable reason, no party has suggested that we go so far.

For these reasons, I agree that *Pennsylvania Fire* controls our decision here, but I stress that it does so due to the clear overlap with the facts of this case.

## II

## A

While that is the end of the case before us, it is not the end of the story for registration-based jurisdiction.   We have long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests.   This principle, an "obviou[s]" and "necessary result" of our constitutional order, is not confined to any one clause or section, but is expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' interactions with one another.   *New York Life Ins. Co.* v. *Head*, 234 U. S. 149, 161 (1914).[2]

The dissent suggests that we apply this principle through the Due Process Clause of the Fourteenth Amendment, *post*,

---

[1] See, *e. g.*, U. S. Chamber of Commerce Institute for Legal Reform, Nuclear Verdicts: Trends, Causes, and Solutions 20 (2022); M. Behrens & C. Silverman, Litigation Tourism in Pennsylvania: Is Venue Reform Needed? 22 Widener L. J. 29, 30–31 (2012).

[2] See, *e. g.*, *Florida* v. *Georgia*, 17 How. 478, 494 (1855); *Bonaparte* v. *Tax Court*, 104 U. S. 592, 594 (1882); *Huntington* v. *Attrill*, 146 U. S. 657, 669 (1892); *Alaska Packers Assn.* v. *Industrial Accident Comm'n of Cal.*, 294 U. S. 532, 540 (1935); *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 521–523 (1935); *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 571–572, and n. 16 (1996); *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 422 (2003).

at 169–171, and there is support for this argument in our case law, if not in the ordinary meaning of the provision's wording. By its terms, the Due Process Clause is about procedure, but over the years, it has become a refuge of sorts for constitutional principles that are not "procedural" but would otherwise be homeless as the result of having been exiled from the provisions in which they may have originally been intended to reside. This may be true, for example, with respect to the protection of substantive rights that might otherwise be guaranteed by the Fourteenth Amendment's Privileges and Immunities Clause. See *McDonald* v. *Chicago*, 561 U. S. 742, 754–759 (2010) (plurality opinion); *id.*, at 808–812 (THOMAS, J., concurring in part and concurring in judgment). And in a somewhat similar way, our due process decisions regarding personal jurisdiction have often invoked respect for federalism as a factor in their analyses.

In our first decision holding that the Fourteenth Amendment's Due Process Clause protects a civil defendant from suit in certain fora, the Court proclaimed that "no State can exercise direct jurisdiction and authority over persons or property without its territory." *Pennoyer* v. *Neff*, 95 U. S. 714, 722 (1878). "The several States," the Court explained, "are of equal dignity and authority, and the independence of one implies the exclusion of power from all others." *Ibid.* The Court warned that, in certain circumstances, a State's exercise of jurisdiction over non-residents would be "an encroachment upon the independence of [another] State" and a "usurpation" of that State's authority. *Id.*, at 723. And the Court noted that this was not a newly-developed doctrine, but reflected "well-established principles of public law" that "ha[d] been frequently expressed . . . in opinions of eminent judges, and . . . carried into adjudications in numerous cases." *Id.*, at 722, 724; see, *e. g.*, *D'Arcy* v. *Ketchum*, 11 How. 165, 176 (1851); *Picquet* v. *Swan*, 19 F. Cas. 609, 612 (No. 11,134) (CC Mass. 1828) (Story, J.).

Our post-*International Shoe* decisions have continued to recognize that constitutional restrictions on state court jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation," but reflect "territorial limitations" on state power. *Hanson* v. *Denckla*, 357 U. S. 235, 251 (1958); see also *World-Wide Volkswagen*, 444 U. S., at 292 (in addition to "protect[ing] the defendant against the burdens of litigating in a distant or inconvenient forum," due process "acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system"); *id.*, at 293 ("The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment"); *J. McIntyre Machinery*, 564 U. S., at 884 (plurality opinion) (if a "State were to assert jurisdiction in an inappropriate case, it would upset the federal balance, which posits that each State has a sovereignty that is not subject to unlawful intrusion by other States"). And we have recognized that in some circumstances, "federalism interest[s] may be decisive" in the due process analysis. *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 263 (2017).

Despite these many references to federalism in due process decisions, there is a significant obstacle to addressing those concerns through the Fourteenth Amendment here: we have never held that a State's assertion of jurisdiction unconstitutionally intruded on the prerogatives of another State when the defendant had consented to jurisdiction in the forum State. Indeed, it is hard to see how such a decision could be justified. The Due Process Clause confers a right on "person[s]," Amdt. 14, § 1, not States. If a person voluntarily waives that right, that choice should be honored. See *Insurance Corp. of Ireland*, 456 U. S., at 703; *ante*, at 148 (JACKSON, J., concurring).

B

1

The federalism concerns that this case presents fall more naturally within the scope of the Commerce Clause.[3] "By its terms, the Commerce Clause grants Congress the power '[t]o regulate Commerce . . . among the several States.'" *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 440 (1978) (quoting Art. I, §8, cl. 3). But this Court has long held that the Clause includes a negative component, the so-called dormant Commerce Clause, that "prohibits state laws that unduly restrict interstate commerce." *Tennessee Wine and Spirits Retailers Assn.* v. *Thomas*, 588 U. S. –––, ––– – ––– (2019); see, *e. g.*, *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318–319 (1852); *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245, 252 (1829).

While the notion that the Commerce Clause restrains States has been the subject of "thoughtful critiques," the concept is "deeply rooted in our case law," *Tennessee Wine*, 588 U. S., at –––, and vindicates a fundamental aim of the Constitution: fostering the creation of a national economy and avoiding the every-State-for-itself practices that had weakened the country under the Articles of Confederation. See *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979); *Healy* v. *Beer Institute*, 491 U. S. 324, 335–336 (1989). The Framers "might have thought [that other provisions] would fill that role," but "at this point in the Court's history, no

---

[3] Analyzing these concerns under the Commerce Clause has the additional advantage of allowing Congress to modify the degree to which States should be able to entertain suits involving out-of-state parties and conduct. If Congress disagrees with our judgment on this question, it "has the authority to change the . . . rule" under its own Commerce power, subject, of course, to any other relevant constitutional limit. *South Dakota* v. *Wayfair, Inc.*, 585 U. S. –––, ––– – ––– (2018); see also *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769–770 (1945).

provision other than the Commerce Clause could easily do the job." *Tennessee Wine*, 588 U. S., at ——.[4]

In its negative aspects, the Commerce Clause serves to "mediate [the States'] competing claims of sovereign authority" to enact regulations that affect commerce among the States. *National Pork Producers Council* v. *Ross*, 598 U. S. 356, 376 (2023). The doctrine recognizes that "one State's power to impose burdens on . . . interstate market[s] . . . is not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States." *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 571 (1996) (citing *Gibbons* v. *Ogden*, 9 Wheat. 1, 194–196 (1824)). It is especially appropriate to look to the dormant Commerce Clause in considering the constitutionality of the authority asserted by Pennsylvania's registration scheme. Because the right of an out-of-state corporation to do business in another State is based on the

---

[4] In the past, the Court recognized that the Import-Export Clause, Art. I, §10, cl. 2, and the Privileges and Immunities Clause, Art. IV, §2, might restrict state regulations that interfere with the national economy. See, *e. g.*, *Brown* v. *Maryland*, 12 Wheat. 419, 445–449 (1827) (reading Import-Export Clause to prohibit state laws imposing duties on "importations from a sister State"); *Almy* v. *California*, 24 How. 169, 175 (1861) (applying Import-Export Clause to invalidate state law taxing gold and silver shipments between States); *Toomer* v. *Witsell*, 334 U. S. 385, 396, and n. 26 (1948) (observing that the Privileges and Immunities Clause guarantees out-of-state citizens the right to do business in a State on equal terms with state citizens (citing *Ward* v. *Maryland*, 12 Wall. 418 (1871))). But the Court has since narrowed the scope of these provisions. See *Woodruff* v. *Parham*, 8 Wall. 123, 136–137 (1869) (holding that the Import-Export Clause applies only to international trade); *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.*, 451 U. S. 648, 656 (1981) (observing that "the Privileges and Immunities Clause is inapplicable to corporations" (citing *Hemphill* v. *Orloff*, 277 U. S. 537, 548–550 (1928))). Whether or not these restrictive interpretations are correct as an original matter, they are entrenched. Unless we overrule them, we must look elsewhere if "a national economic union unfettered by state-imposed limitations on commerce" is to be preserved. *Healy*, 491 U. S., at 336.

dormant Commerce Clause, it stands to reason that this doctrine may also limit a State's authority to condition that right.  See *Granholm* v. *Heald*, 544 U. S. 460, 472 (2005); *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 539 (1949).

2

This Court and other courts have long examined assertions of jurisdiction over out-of-state companies in light of interstate commerce concerns.[5]  Consider *Davis* v. *Farmers Co-operative Equity Co.*, 262 U. S. 312 (1923), a case very much like the one now before us.  In *Davis*, a Kansas company sued a Kansas railroad in Minnesota on a claim that was "in no way connected with Minnesota."  *Id.*, at 314.  Jurisdiction over the railroad was based on its compliance with a state statute regulating the in-state activities of out-of-state corporations: the railroad maintained a soliciting agent in Minnesota, and the Minnesota Supreme Court had interpreted state law as compelling out-of-state carriers, as a "condition of maintaining a soliciting agent," to "submit to suit" in Minnesota on any "cause of action, wherever it may have arisen."  *Id.*, at 315.

The Minnesota Supreme Court upheld jurisdiction against the railroad, but we reversed, holding that Minnesota's condition "impos[ed] upon interstate commerce a serious and unreasonable burden, which renders the statute obnoxious to the [C]ommerce [C]lause."  *Ibid.*  "By requiring from interstate carriers general submission to suit," Minnesota's stat-

---

[5] See, *e. g.*, *Atchison, T. & S. F. R. Co.* v. *Wells*, 265 U. S. 101, 103 (1924); *Michigan Central R. Co.* v. *Mix*, 278 U. S. 492, 494–495 (1929); *Denver & Rio Grande Western R. Co.* v. *Terte*, 284 U. S. 284, 287 (1932); *Baltimore & Ohio R. Co.* v. *Kepner*, 314 U. S. 44, 50–51 (1941); *Moss* v. *Atlantic Coast Line R. Co.*, 157 F. 2d 1005, 1007 (CA2 1946); *Kern* v. *Cleveland, C., C. & St. L. R. Co.*, 204 Ind. 595, 601–604, 185 N. E. 446, 448–449 (1933); *Hayman* v. *Southern Pacific Co.*, 278 S. W. 2d 749, 753 (Mo. 1955); *White* v. *Southern Pacific Co.*, 386 S. W. 2d 6, 7–9 (Mo. 1965).

ute "unreasonably obstruct[ed], and unduly burden[ed], interstate commerce." *Id.*, at 317.[6]

Although we have since refined our Commerce Clause framework, the structural constitutional principles underlying these decisions are unchanged, and the Clause remains a vital constraint on States' power over out-of-state corporations.

C

In my view, there is a good prospect that Pennsylvania's assertion of jurisdiction here—over an out-of-state company in a suit brought by an out-of-state plaintiff on claims wholly unrelated to Pennsylvania—violates the Commerce Clause.

Under our modern framework, a state law may offend the Commerce Clause's negative restrictions in two circumstances: when the law discriminates against interstate commerce or when it imposes "undue burdens" on interstate commerce. *South Dakota* v. *Wayfair, Inc.*, 585 U. S. —, — (2018). Discriminatory state laws are subject to "'a virtually *per se* rule of invalidity.'" *Ibid.* (quoting *Granholm*, 544 U. S., at 476). "[O]nce a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,'" the law's proponent must "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986). Justification of a discriminatory law faces a "high" bar to overcome the presumption of invalidity. *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 278 (1988). Laws that "'even-handedly'" regulate to advance "'a legitimate local public interest'" are subject to a looser standard. *Wayfair*, 585 U. S., at —. These laws will be upheld "'unless the burden imposed on [interstate] commerce is clearly excessive

---

[6] Because we resolved the case under the Commerce Clause, we declined to consider the railroad's Fourteenth Amendment challenges. *Davis* v. *Farmers Co-operative Equity Co.*, 262 U. S. 312, 318 (1923).

in relation to the putative local benefits.'"  *Ibid.*  In these circumstances, "'the question becomes one of degree,'" and "'the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved.'"  *Raymond Motor Transp.*, 434 U. S., at 441.  See also *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).

There is reason to believe that Pennsylvania's registration-based jurisdiction law discriminates against out-of-state companies.[7]  But at the very least, the law imposes a "significant burden" on interstate commerce by "[r]equiring a foreign corporation . . . to defend itself with reference to all transactions," including those with no forum connection. *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 893 (1988); see, *e. g.*, *Davis*, 262 U. S., at 315–317 (burden in these circumstances is "serious and unreasonable," "heavy," and "undu[e]"); *Michigan Central R. Co.* v. *Mix*, 278 U. S. 492, 495 (1929) (burden is "heavy"); *Denver & Rio Grande Western R. Co.* v. *Terte*, 284 U. S. 284, 287 (1932) (burden is "serious"); *Atchison, T. & S. F. R. Co.* v. *Wells*, 265 U. S. 101, 103 (1924) (jurisdiction "interfered unreasonably with interstate commerce").

The foreseeable consequences of the law make clear why this is so.  Aside from the operational burdens it places on out-of-state companies, Pennsylvania's scheme injects intolerable unpredictability into doing business across state borders.  Large companies may be able to manage the patch-

--------

[7] See, *e. g.*, J. Preis, The Dormant Commerce Clause as a Limit on Personal Jurisdiction, 102 Iowa L. Rev. 138–140 (2016).  A state law discriminates against interstate commerce if its "'practical effect'" is to disadvantage out-of-state companies to the benefit of in-state competitors. *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986); see *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. 330, 338 (2007).  Pennsylvania's law seems to discriminate against out-of-state companies by forcing them to increase their exposure to suits on all claims in order to access Pennsylvania's market while Pennsylvania companies generally face no reciprocal burden for expanding operations into another State.

work of liability regimes, damages caps, and local rules in each State, but the impact on small companies, which constitute the majority of all U. S. corporations, could be devastating.[8] Large companies may resort to creative corporate structuring to limit their amenability to suit. Small companies may prudently choose not to enter an out-of-state market due to the increased risk of remote litigation. Some companies may forgo registration altogether, preferring to risk the consequences rather than expand their exposure to general jurisdiction. "No one benefits from this 'efficient breach' of corporate-registration laws": corporations must manage their added risk, and plaintiffs face challenges in serving unregistered corporations. Brief for Tanya Monestier as *Amicus Curiae* 16. States, meanwhile, "would externalize the costs of [their] plaintiff-friendly regimes." Brief for Stephen E. Sachs as *Amicus Curiae* 26.

Given these serious burdens, to survive Commerce Clause scrutiny under this Court's framework, the law must advance a "'legitimate local public interest'" and the burdens must not be "'clearly excessive in relation to the putative local benefits.'" *Wayfair*, 585 U. S., at ——. But I am hard-pressed to identify any *legitimate local* interest that is advanced by requiring an out-of-state company to defend a suit brought by an out-of-state plaintiff on claims wholly unconnected to the forum State. A State certainly has a legitimate interest in regulating activities conducted within its borders, which may include providing a forum to redress harms that occurred within the State. *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 422 (2003); *BMW of North America*, 517 U. S., at 568–569; *Hess* v. *Pawloski*, 274 U. S. 352, 356 (1927). A State also may have an

---

[8] Congressional Research Service, M. Keightley & J. Hughes, Pass-Throughs, Corporations, and Small Businesses: A Look at Firm Size 4–5 (2018) (in 2015, 62% of S corporations and 55% of C corporations had fewer than five employees).

interest "in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U. S., at 473. But a State generally does *not* have a legitimate local interest in vindicating the rights of non-residents harmed by out-of-state actors through conduct outside the State. See, *e. g.*, *Edgar* v. *MITE Corp.*, 457 U. S. 624, 644 (1982). With no legitimate local interest served, "there is nothing to be weighed . . . to sustain the law." *Ibid.* And even if some legitimate local interest could be identified, I am skeptical that any local benefits of the State's assertion of jurisdiction in these circumstances could overcome the serious burdens on interstate commerce that it imposes. See, *e. g.*, *id.*, at 643–646; *Raymond Motor Transp.*, 434 U. S., at 444–446.

\*          \*          \*

Because *Pennsylvania Fire* resolves this case in favor of petitioner Mallory and no Commerce Clause challenge is before us, I join the Court's opinion as stated in Parts I and III–B, and agree that the Pennsylvania Supreme Court's judgment should be vacated and the case remanded for further proceedings.

JUSTICE BARRETT, with whom THE CHIEF JUSTICE, JUSTICE KAGAN, and JUSTICE KAVANAUGH join, dissenting.

For 75 years, we have held that the Due Process Clause does not allow state courts to assert general jurisdiction over foreign defendants merely because they do business in the State. *International Shoe Co.* v. *Washington*, 326 U. S. 310, 317 (1945). Pennsylvania nevertheless claims general jurisdiction over all corporations that lawfully do business within its borders. As the Commonwealth's own courts recognized, that flies in the face of our precedent. See *Daimler AG* v. *Bauman*, 571 U. S. 117, 139–140 (2014).

The Court finds a way around this settled rule. All a State must do is compel a corporation to register to conduct

business there (as every State does) and enact a law making registration sufficient for suit on any cause (as every State could do). Then, every company doing business in the State is subject to general jurisdiction based on implied "consent"—not contacts. That includes suits, like this one, with no connection whatsoever to the forum.

Such an approach does not formally overrule our traditional contacts-based approach to jurisdiction, but it might as well. By relabeling their long-arm statutes, States may now manufacture "consent" to personal jurisdiction. Because I would not permit state governments to circumvent constitutional limits so easily, I respectfully dissent.

I

A

Personal jurisdiction is the authority of a court to issue a judgment that binds a defendant. If a defendant submits to a court's authority, the court automatically acquires personal jurisdiction. *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703 (1982). But if a defendant *contests* the court's authority, the court must determine whether it can nevertheless assert coercive power over the defendant. That calculus turns first on the statute or rule defining the persons within the court's reach. See *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 290 (1980). It depends next on the Due Process Clause, which guards a defendant's right to resist the judicial authority of a sovereign to which it has an insufficient tie. *International Shoe*, 326 U. S., at 316. The Clause has the companion role of ensuring that state courts "do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen*, 444 U. S., at 291–292.

Our precedent divides personal jurisdiction into two categories: specific and general. Both are subject to the demands of the Due Process Clause. Specific jurisdiction, as

its name suggests, allows a state court to adjudicate specific claims against a defendant. When a defendant "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson* v. *Denckla*, 357 U. S. 235, 253 (1958), that State's courts may adjudicate claims that "'arise out of or relate to the defendant's contacts' with the forum," *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. ⸺, ⸺ (2021) (quoting *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 262 (2017)).

General jurisdiction, by contrast, allows a state court to adjudicate "'any and all claims' brought against a defendant." *Ford Motor*, 592 U. S., at ⸺ (quoting *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 919 (2011)). This sweeping authority exists only when the defendant's connection to the State is tight—so tight, in fact, that the defendant is "'at home'" there. *Ford Motor*, 592 U. S., at ⸺. An individual is typically "at home" in her domicile, *Goodyear*, 564 U. S., at 924, and a corporation is typically "at home" in both its place of incorporation and principal place of business, *Daimler*, 571 U. S., at 137. Absent an exceptional circumstance, general jurisdiction is cabined to these locations. *Id.*, at 139.

B

This case involves a Pennsylvania statute authorizing courts to exercise general jurisdiction over corporations that are not "at home" in the Commonwealth. All foreign corporations must register to do business in Pennsylvania, 15 Pa. Cons. Stat. § 411(a) (2014), and all registrants are subject to suit on "any cause" in the Commonwealth's courts, 42 Pa. Cons. Stat. §§ 5301(a)(2)(i), (b) (2019). Section 5301 thus purports to empower Pennsylvania courts to adjudicate any and all claims against corporations doing business there.

As the Pennsylvania Supreme Court recognized, this statute "clearly, palpably, and plainly violates the Constitution."

266 A. 3d 542, 565–566 (2021).    Look no further than *BNSF R. Co.* v. *Tyrrell*, a case with remarkably similar facts—and one that the Court conspicuously ignores. 581 U. S. 402 (2017).    There, we assessed whether Montana's courts could exercise general jurisdiction over the BNSF railroad.    No plaintiff resided in Montana or suffered an injury there. Like Mallory, one of the plaintiffs alleged that the railroad exposed him to toxic substances that caused his cancer.    *Id.*, at 406.    Like Norfolk Southern, BNSF had tracks and employees in the forum, but it was neither incorporated nor headquartered there.    *Id.*, at 406–407.    We rejected Montana's assertion of general jurisdiction over BNSF because "in-state business . . . does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity occurring in [the State]."    *Id.*, at 414.    *Daimler* and *Goodyear*, we explained, could not have made that any clearer.    *BNSF*, 581 U. S., at 414.

The same rule applies here.    The Pennsylvania statute announces that registering to do business in the Commonwealth "shall constitute a sufficient basis" for general jurisdiction.    § 5301(a).    But as our precedent makes crystal clear, simply doing business is *insufficient*.    Absent an exceptional circumstance, a corporation is subject to general jurisdiction only in a State where it is incorporated or has its principal place of business.    *Ford Motor*, 592 U. S., at ——; *Daimler*, 571 U. S., at 139; *Goodyear*, 564 U. S., at 924.    Adding the antecedent step of registration does not change that conclusion.    If it did, "every corporation would be subject to general jurisdiction in every state in which it registered, and *Daimler's* ruling would be robbed of meaning by a back-door thief."    *Brown* v. *Lockheed Martin Corp.*, 814 F. 3d 619, 640 (CA2 2016).

## II

### A

The Court short-circuits this precedent by characterizing this case as one about consent rather than contacts-based

jurisdiction.   Consent is an established basis for personal ju-
risdiction, which is, after all, a waivable defense.   "A variety
of legal arrangements have been taken to represent express
or implied consent to the personal jurisdiction of the court,"
including contract, stipulation, and in-court appearance.   *In-
surance Corp. of Ireland*, 456 U. S., at 703–704.   Today, the
Court adds corporate registration to the list.

This argument begins on shaky ground, because Pennsyl-
vania itself does not treat registration as synonymous with
consent.   Section 5301(a)(2)(i) baldly asserts that "qualifica-
tion as a foreign corporation" in the Commonwealth is a suf-
ficient hook for general jurisdiction.   The *next* subsection
(invoked by neither Mallory nor the Court) permits the exer-
cise of general jurisdiction over a corporation based on
"[c]onsent, to the extent authorized by the consent."
§ 5301(a)(2)(ii).   If registration were actual consent, one
would expect to see some mention of jurisdiction in Norfolk
Southern's registration paperwork—which is instead wholly
silent on the matter.   App. 1–7.   What Mallory calls "con-
sent" is what the Pennsylvania Supreme Court called "com-
pelled submission to general jurisdiction by legislative com-
mand."   266 A. 3d, at 569.   Corporate registration triggers
a statutory repercussion, but that is not "consent" in a con-
ventional sense of the word.

To pull § 5301(a)(2)(i) under the umbrella of consent, the
Court, following Mallory, casts it as setting the terms of a
bargain: In exchange for access to the Pennsylvania market,
a corporation must allow the Commonwealth's courts to ad-
judicate any and all claims against it, even those (like Mal-
lory's) having nothing to do with Pennsylvania.   Brief for
Petitioner 27–28.   Everyone is charged with knowledge of
the law, so corporations are on notice of the deal.   By regis-
tering, they agree to its terms.

While this is a clever theory, it falls apart on inspection.
The Court grounds consent in a corporation's choice to regis-
ter with knowledge (constructive or actual) of the jurisdic-

tional consequences. *Ante*, at 134–135, 144 ("proceed[ing] anyway" in light of "the jurisdictional consequences attending these actions"); *ante*, at 151 (ALITO, J., concurring in part and concurring in judgment) (basing "consent" on "presume[d]" knowledge of state law); *ante*, at 149 (JACKSON, J., concurring) ("register[ing] and do[ing] business in Pennsylvania despite the jurisdictional consequences"). But on that logic, *any* long-arm statute could be said to elicit consent. Imagine a law that simply provides, "any corporation doing business in this State is subject to general jurisdiction in our courts." Such a law defies our precedent, which, again, holds that "in-state business . . . does not suffice to permit the assertion of general jurisdiction." *BNSF*, 581 U. S., at 414. Yet this hypothetical law, like the Pennsylvania statute, gives notice that general jurisdiction is the price of doing business. And its "notice" is no less "clear" than Pennsylvania's. *Ante*, at 153 (opinion of ALITO, J.). So on the Court's reasoning, corporations that choose to do business in the State impliedly consent to general jurisdiction. The result: A State could defeat the Due Process Clause by adopting a law at odds with the Due Process Clause.

That makes no sense. If the hypothetical statute overreaches, then Pennsylvania's does too. As the United States observes, "[i]nvoking the label 'consent' rather than 'general jurisdiction' does not render Pennsylvania's long-arm statute constitutional." Brief for United States as *Amicus Curiae* 4. Yet the Court takes this route without so much as acknowledging its circularity.

## B

While our due process precedent permits States to place reasonable conditions on foreign corporations in exchange for access to their markets, there is nothing reasonable about a State extracting consent in cases where it has "no connection whatsoever." 266 A. 3d, at 566; *Bristol-Myers*, 582 U. S., at 263; see *Lafayette Ins. Co.* v. *French*, 18 How. 404, 407 (1856).

The Due Process Clause protects more than the rights of defendants—it also protects interstate federalism. We have emphasized this principle in case after case. For instance, in *Hanson* v. *Denckla*, we stressed that "restrictions" on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." 357 U. S., at 250–251. In *World-Wide Volkswagen*, we explained that "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State . . . the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." 444 U. S., at 294. And in *Bristol-Myers*, we reinforced that "this federalism interest may be decisive." 582 U. S., at 263; see also, *e. g.*, *Ford Motor*, 592 U. S., at ——; *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 113, 115 (1987); *International Shoe*, 326 U. S., at 317. A defendant's ability to waive its objection to personal jurisdiction reflects that the Clause protects, first and foremost, an individual right. But when a State announces a blanket rule that ignores the territorial boundaries on its power, federalism interests are implicated too.

Pennsylvania's effort to assert general jurisdiction over every company doing business within its borders infringes on the sovereignty of its sister States in a way no less "exorbitant" and "grasping" than attempts we have previously rejected.[1] *Daimler*, 571 U. S., at 121–122, 138–139. Condi-

---

[1] This case provides a "textbook example" of overreach at the expense of other States. 266 A. 3d 542, 567 (Pa. 2021). Virginia has considerable connections to Mallory's suit: Mallory lives in Virginia, Norfolk Southern is a Virginia corporation, Mallory's injuries arose—at least in part—from his employment in Virginia, and he was diagnosed with cancer there. See *ante*, at 126; Tr. of Oral Arg. 39. Pennsylvania, by contrast, "has no legitimate interest in a controversy with no connection to the Commonwealth

tions on doing in-state business cannot be "inconsistent with those rules of public law which secure the jurisdiction and authority of each State from encroachment by all others." *Lafayette*, 18 How., at 407; *St. Clair* v. *Cox*, 106 U. S. 350, 356 (1882). Permitting Pennsylvania to impose a blanket claim of authority over controversies with no connection to the Commonwealth intrudes on the prerogatives of other States—domestic and foreign—to adjudicate the rights of their citizens and enforce their own laws. See *Ford Motor*, 592 U. S., at —— – ——; *Daimler*, 571 U. S., at 141–142.

The plurality's response is to fall back, yet again, on "consent." *Ante*, at 144, 146, n. 11. In its view, because a defendant can *waive* its personal jurisdiction right, a State can never overreach in demanding its *relinquishment*. *Ibid.*; see also *ante*, at 156 (opinion of ALITO, J.); *ante*, at 147–149 (opinion of JACKSON, J.). That is not how we treat rights with structural components. The right to remove a case to federal court, for instance, is primarily personal—it secures for a nonresident defendant a federal forum thought to be more impartial. See The Federalist No. 80, p. 478 (C. Rossiter ed. 1961) (A. Hamilton). At the same time, however, it serves federal interests by ensuring that federal courts can vindicate federal rights. See, *e. g.*, *Georgia* v. *Rachel*, 384 U. S. 780, 804–805 (1966). Recognizing this dual role, we have rejected efforts of States to require defendants to relinquish this (waivable) right to removal as a condition of doing business. See *Home Ins. Co.* v. *Morse*, 20 Wall. 445, 453, 456–458 (1874) (citing *Lafayette*, 18 How., at 407); *Barron* v. *Burnside*, 121 U. S. 186, 196–198 (1887) ("[W]hile the right to remove a suit might be waived," a statute may not require a foreign corporation "to forfeit [its] rights at all times and on all occasions, whenever the case might be presented"). The same logic applies here. Pennsylvania's power grab in-

———

that was filed by a non-resident against a foreign corporation." 266 A. 3d, at 567.

fringes on more than just the rights of defendants—it upsets the proper role of the States in our federal system.

## III

### A

The plurality attempts to minimize the novelty of its conclusion by pointing to our decision in *Burnham* v. *Superior Court of Cal.*, *County of Marin*, 495 U. S. 604 (1990). There, we considered whether "tag jurisdiction"—personal service upon a defendant physically present in the forum State— remains an effective basis for general jurisdiction after *International Shoe*. *Burnham*, 495 U. S., at 607 (opinion of Scalia, J.). We unanimously agreed that it does. *Id.*, at 619, 622; *id.*, at 628 (White, J., concurring in part and concurring in judgment); *id.*, at 628–629 (Brennan, J., concurring in judgment); *id.*, at 640 (Stevens, J., concurring in judgment). The plurality claims that registration jurisdiction for a corporation is just as valid as the "tag jurisdiction" that we approved in *Burnham*. But in drawing this analogy, the plurality omits any discussion of *Burnham*'s reasoning.

In *Burnham*, we acknowledged that tag jurisdiction would not satisfy the contacts-based test for general jurisdiction. Nonetheless, we reasoned that tag jurisdiction is "both firmly approved by tradition and still favored," making it "one of the continuing traditions of our legal system that define[s] the due process standard of 'traditional notions of fair play and substantial justice.'" *Id.*, at 619 (opinion of Scalia, J.) (quoting *International Shoe*, 326 U. S., at 316); see also 495 U. S., at 635–637 (Brennan, J., concurring in judgment) (a jurisdictional rule that reflects "our common understanding *now*, fortified by a century of judicial practice, . . . is entitled to a strong presumption that it comports with due process"). *Burnham* thus permits a longstanding and still-accepted basis for jurisdiction to pass *International Shoe*'s test.

General-jurisdiction-by-registration flunks both of these prongs: It is neither "firmly approved by tradition" nor "still favored." 495 U. S., at 622 (opinion of Scalia, J.). Thus, the plurality's analogy to tag jurisdiction is superficial at best.

Start with the second prong. In *Burnham*, "[w]e [did] not know of a single state . . . that [had] abandoned in-state service as a basis of jurisdiction." *Id.*, at 615. Here, as Mallory concedes, Pennsylvania is the *only* State with a statute treating registration as sufficient for general jurisdiction. Tr. of Oral Arg. 47. Indeed, quite a few have jettisoned the jurisdictional consequences of corporate registration altogether—and in no uncertain terms. See, *e. g.*, *Chavez* v. *Bridgestone Americas Tire Operations, LLC*, 2022–NMSC–006, ¶¶1, 53–54, 503 P. 3d 332, 336, 349 ("Reliance upon outdated legal fictions . . . would be absurd and, as explained above, inconsistent with contemporary understandings of due process"); *Genuine Parts Co.* v. *Cepec*, 137 A. 3d 123, 137 (Del. 2016) ("[W]e no longer live in a time where foreign corporations cannot operate in other states unless they somehow become a resident"); see also *DeLeon* v. *BNSF R. Co.*, 392 Mont. 446, 453, n. 1, 426 P. 3d 1, 7, n. 1 (2018) (listing States with statutes that do not permit the practice).[2] With the Pennsylvania Legislature standing alone, the plurality does not even attempt to describe this method of securing general jurisdiction as "still favored," *Burnham*, 495 U. S., at 622 (opinion of Scalia, J.), or reflective of "our common understanding now," *id.*, at 635–637 (Brennan, J., concurring in judgment) (emphasis deleted). Quite the op-

---

[2] The plurality offers only one other State that (through its Supreme Court) has treated foreign corporate registration as adequate support for general jurisdiction following *Daimler* and *Goodyear*. See *Cooper Tire & Rubber Co.* v. *McCall*, 312 Ga. 422, 436–437, 863 S. E. 2d 81, 92 (2021). There, a judicial precedent, not a long-arm statute, maintained that registration justified general jurisdiction. Applying the consent theory, the Georgia Supreme Court held that corporations that choose to do business in the State are on notice of the jurisdictional consequences of its case law. *Id.*, at 434, 863 S. E. 2d, at 90.

posite: The plurality denigrates "the spirit of our age"—reflected by the vast majority of States—and appeals to its own notions of fairness. *Ante*, at 141–143.

The past is as fatal to the plurality's theory as the present. *Burnham*'s tradition prong asks whether a method for securing jurisdiction was "shared by American courts at the crucial time"—"1868, when the Fourteenth Amendment was adopted." 495 U. S., at 611 (opinion of Scalia, J.). But the plurality cannot identify a *single* case from that period supporting its theory.[3] In fact, the evidence runs in the opposite direction. Statutes that required the appointment of a registered agent for service of process were far more modest than Pennsylvania's.[4] And even when a statute was written more broadly, state courts generally understood it to implicitly limit jurisdiction to suits with a connection to the forum.

---

[3] The plurality argues that the uniform practice of state courts at the time of ratification is inapposite because no state court held that general-jurisdiction-by-registration violates the Fourteenth Amendment. *Ante*, at 131, n. 4. This approach reflects a misunderstanding of *Burnham*. The inquiry is not whether courts rejected a process for obtaining jurisdiction as unconstitutional. It is whether courts *actually used*—and continue to use—the challenged process. 495 U. S., at 622 (opinion of Scalia, J.); see also *Hurtado* v. *California*, 110 U. S. 516, 528 (1884) ("[A] process of law . . . must be taken to be due process of law" if it "has been immemorially the actual law of the land"). Registration jurisdiction falls short on both fronts.

[4] Many States expressly limited their statutes to disputes with *a connection to the State.* See, *e. g.*, Ind. Code § 25–2 (1852) (foreign corporations must consent to actions "arising out of any transaction in this State"), App. to Brief for Petitioner 47a; Conn. Gen. Stat. § 7–389 (1866) (foreign insurance companies must appoint an in-state agent to accept process "in all suits before any court in this state, for any liability incurred by such company or association in this state"), App. to Brief for Petitioner 18a; Md. Code Ann. § 26–211 (1868) (foreign corporation may be sued by nonresident "when the cause of action has arisen, or the subject of the action shall be situate[d] in this state"), App. to Brief for Petitioner 90a; S. C. Code Ann. § 13–1–422(2) (1873) (nonresident may sue a foreign corporation "when the cause of action shall have arisen, or the subject of the action shall be situated, within this State"), App. to Brief for Petitioner 227a.

The state reporters are replete with examples of judicial decisions that stood by the then-prevailing rule: Compliance with a registration law did not subject a foreign corporation to suit on *any* cause in a State, but only those related to the forum. *Smith* v. *Mutual Life Ins. Co. of N. Y.*, 96 Mass. 336, 340–343 (1867); see also, *e. g.*, *Camden Rolling Mill* v. *Swede Iron Co.*, 32 N. J. L. 15, 18 (1866) (rejecting a statutory construction that would "place within the jurisdiction of our courts, all the corporations of the world"); *Newell* v. *Great W. R. Co. of Canada*, 19 Mich. 336, 345–346 (1869) (legislature "could never have intended . . . to make our tribunals, maintained by the people of Michigan, the arbiters of differences in which our citizens have no interest"); *Sawyer* v. *North Am. Life Ins. Co.*, 46 Vt. 697, 707 (1874) (broadly worded statute did not reach a corporate "party not a resident, on a cause of action which did not accrue here"); *Central R. & Banking Co.* v. *Carr*, 76 Ala. 388, 393 (1884) (collecting cases).[5] Our cases from this era articulate the same line. See, *e. g.*, *Lafayette*, 18 How., at 407 (statutory consent to suit may reach "contracts made and to be performed within that State"); *St. Clair*, 106 U. S., at 356–357 (statutory consent permitted for suits "arising out of [a foreign corporation's] transactions in the State"); *Old Wayne Mut. Life Assn. of Indianapolis* v. *McDonough*, 204 U. S. 8, 21 (1907) ("[I]t cannot be held that the company agreed that service of process . . . would alone be sufficient to bring it into court in respect of *all* business transacted by it, no matter where"); *Simon* v. *Southern R. Co.*, 236 U. S. 115, 130 (1915) ("statutory consent of a foreign corporation to be sued does not extend to causes of action arising in other states"). Although "plaintiffs typi-

───────────

[5] Mallory cannot find an example of an exercise of registration jurisdiction without a forum connection until 1882. See *Johnston* v. *Trade Ins. Co.*, 132 Mass. 432, 434–435. But even that example ignores Massachusetts's rejection of registration jurisdiction for cases with no connection to the forum in 1867—the year it ratified the Fourteenth Amendment. See *Smith*, 96 Mass., at 340–343.

cally did not sue defendants in fora that had no rational relation to causes of action," *Genuine Parts*, 137 A. 3d, at 146, courts repeatedly turned them away when they did.

### B

Sidestepping *Burnham*'s logic, the plurality seizes on its bottom-line approval of tag jurisdiction. According to the plurality, tag jurisdiction (based on physical presence) and registration jurisdiction (based on deemed consent) are essentially the same thing—so by blessing one, *Burnham* blessed the other. See *ante*, at 125–126, 139–140. The plurality never explains why they are the same, even though—as we have just discussed—more than a century's worth of law treats them as distinct. See also *Burnham*, 495 U. S., at 610, n. 1 (opinion of Scalia, J.) (corporations "have never fi[t] comfortably in a jurisdictional regime based primarily upon 'de facto power over the defendant's person'"); *International Shoe*, 326 U. S., at 316–317. The plurality's rationale seems to be that if a person is subject to general jurisdiction anywhere she is present, then a corporation should be subject to general jurisdiction anywhere it does business. See *ante*, at 125–126, 129–130, 132–134, 139–140, 145. That is not only a non sequitur—it is "contrary to the historical rationale of *International Shoe*." *Wenche Siemer* v. *Learjet Acquisition Corp.*, 966 F. 2d 179, 183 (CA5 1992).

Before *International Shoe*, a state court's power over a person turned strictly on "service of process within the State" (presence) "or [her] voluntary appearance" (consent). *Pennoyer* v. *Neff*, 95 U. S. 714, 733 (1878). In response to changes in interstate business and transportation in the late 19th and early 20th centuries, States deployed new legal fictions designed to secure the presence or consent of nonresident individuals and foreign corporations. For example, state laws required nonresident drivers to give their "implied consent" to be sued for their in-state accidents as a condition of using the road. *Hess* v. *Pawloski*, 274 U. S. 352,

356 (1927); *World-Wide Volkswagen*, 444 U. S., at 296, n. 11. And foreign corporations, as we have discussed, were required by statute to "consent" to the appointment of a resident agent, so that the company could then be constructively "present" for in-state service. *Mutual Reserve Fund Life Assn.* v. *Phelps*, 190 U. S. 147, 158–159 (1903); see *St. Clair*, 106 U. S., at 356.

As Justice Scalia explained, such extensions of "consent and presence were purely fictional" and can no longer stand after *International Shoe*. *Burnham*, 495 U. S., at 618; see also, *e. g.*, *Shaffer* v. *Heitner*, 433 U. S. 186, 202–203 (1977) (*International Shoe* abandoned "both the fictions of implied consent to service on the part of a foreign corporation and of corporate presence"); *McGee* v. *International Life Ins. Co.*, 355 U. S. 220, 222 (1957) (*International Shoe* "abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over [foreign] corporations"); *International Shoe*, 326 U. S., at 318. The very point of *International Shoe* was to "cast . . . aside" the legal fictions built on the old territorial approach to personal jurisdiction and replace them with its contacts-based test. *Burnham*, 495 U. S., at 618 (opinion of Scalia, J.); *id.*, at 630 (Brennan, J., concurring in judgment) (*International Shoe* abandoned the previous " 'patchwork of legal and factual fictions' "). In *Burnham*, we upheld tag jurisdiction because it is not one of those fictions—it *is* presence. By contrast, Pennsylvania's registration statute is based on deemed consent. And this kind of legally implied consent is one of the very fictions that our decision in *International Shoe* swept away. See 326 U. S., at 318; *Ford Motor*, 592 U. S., at —— (GORSUCH, J., concurring in judgment).

## C

Neither JUSTICE ALITO nor the plurality seriously contests this history. Nor does either deny that Mallory's theory would gut *Daimler*. Instead, they insist that we al-

ready decided this question in a pre-*International Shoe*
precedent: *Pennsylvania Fire Ins. Co. of Philadelphia* v.
*Gold Issue Mining & Milling Co.*, 243 U. S. 93 (1917).

In *Pennsylvania Fire*, an Arizona corporation sued a
Pennsylvania corporation in Missouri for a claim arising from
an insurance contract issued in Colorado and protecting
property in Colorado. *Id.*, at 94. The defendant main-
tained that the Missouri court lacked personal jurisdiction
over it because the plaintiff's claim had no connection to the
forum. *Id.*, at 94–95. But in compliance with Missouri law,
the defendant company had previously filed "a power of at-
torney consenting that service of process upon the superin-
tendent [of the State's insurance department] should be
deemed personal service upon the company." *Id.*, at 94.
The Missouri Supreme Court construed that power of attor-
ney as express consent to personal jurisdiction in Missouri
in any case whatsoever, and this Court held that "the con-
struction did not deprive the defendant of due process of
law." *Id.*, at 95.[6]

The Court asserts that *Pennsylvania Fire* controls our
decision today. I disagree. The case was "decided before
this Court's transformative decision on personal jurisdiction
in *International Shoe*," *BNSF*, 581 U. S., at 412, and we have
already stated that "prior decisions [that] are inconsistent
with this standard . . . are overruled," *Shaffer*, 433 U. S., at
212, n. 39. *Pennsylvania Fire* fits that bill. Time and

---

[6] The plurality praises the Missouri Supreme Court's "carefu[l]" and
"thoughtful opinion." *Ante*, at 132–133. Only a decade later, however,
the same court unanimously concluded that it had misinterpreted the
reach of the statute and overruled this aggressive approach. *State ex rel.
Am. Central Life Ins. Co.* v. *Landwehr*, 318 Mo. 181, 190–192, 300 S. W.
294, 297–298 (1927) (requiring a connection to Missouri); *State ex rel. Phoe-
nix Mut. Life Ins. Co. of Hartford* v. *Harris*, 343 Mo. 252, 258–260, 121
S. W. 2d 141, 145–146 (1938). This remains the rule in Missouri today:
Compliance with its registration statute does not constitute consent to
general jurisdiction. *State ex rel. Norfolk Southern R. Co.* v. *Dolan*, 512
S. W. 3d 41, 52–53, and n. 11 (Mo. 2017).

again, we have reinforced that "'doing business' tests"—like those "framed before specific jurisdiction evolved in the United States"—are not a valid basis for general jurisdiction. *Daimler*, 571 U. S., at 140, n. 20. The only innovation of Pennsylvania's statute is to make "doing business" synonymous with "consent." If *Pennsylvania Fire* endorses that trick, then *Pennsylvania Fire* is no longer good law.

The plurality tries to get around *International Shoe* by claiming that it did no more than expand jurisdiction, affecting nothing that came before it.[7] *Ante*, at 138–139. That is as fictional as the old concept of "corporate presence" on which the plurality relies. We have previously abandoned even "ancient" bases of jurisdiction for incompatibility with *International Shoe*. *Shaffer*, 433 U. S., at 211–212 (repudiating *quasi in rem* jurisdiction). And we have repeatedly reminded litigants not to put much stock in our pre-*International Shoe* decisions. *Shaffer*, 433 U. S., at 212, n. 39; see also *BNSF*, 581 U. S., at 412. *Daimler* itself reinforces that pre-*International Shoe* decisions "should not attract heavy reliance today." 571 U. S., at 138, n. 18. Over and over, we have reminded litigants that *International Shoe* is "canonical," "seminal," "pathmarking," and even "momentous"—to give just a few examples. *Ford Motor*, 592 U. S., at ——; *Bristol-Myers*, 582 U. S., at 262; *Daimler*, 571 U. S., at 128; *Goodyear*, 564 U. S., at 919. Yet the Court acts as if none of this ever happened.

In any event, I doubt *Pennsylvania Fire* would control this case even if it remained valid. *Pennsylvania Fire* distinguished between express consent (that is, consent "actually . . . conferred by [the] document") and deemed consent (inferred from doing business). 243 U. S., at 95–96; see

---

[7] While *International Shoe* expanded the bases for *specific* jurisdiction, it did no such thing for *general* jurisdiction. On the contrary, *International Shoe* itself recognized that *general* jurisdiction for a corporation exists in its "'home' or principal place of business." 326 U. S. 310, 317 (1945). That line has remained constant.

also *Neirbo Co.* v. *Bethlehem Shipbuilding Corp.*, 308 U. S. 165, 175 (1939) (basing jurisdiction on "finding an *actual* consent" (emphasis added)). As Judge Learned Hand emphasized in a decision invoked by the plurality, without "express consent," the normal rules apply. *Smolik* v. *Philadelphia & Reading Coal & Iron Co.*, 222 F. 148, 150–151 (SDNY 1915).

The express power of attorney in *Pennsylvania Fire* "made service on the [insurance] superintendent the equivalent of . . . a corporate vote [that] had accepted service in this specific case." 243 U. S., at 95. Norfolk Southern, by contrast, "executed no document like the power of attorney there." Brief for Respondent 31; see App. 1–7. The Court makes much of what Norfolk Southern did write on its forms, *ante*, at 135: It named a "Commercial Registered Office Provider," App. 1, 6, it notified Pennsylvania of a merger, *id.*, at 3–5, and it paid $70 to update its paperwork, *id.*, at 6. None of those documents use the word "agent," nothing hints at the word "jurisdiction," and (as the Pennsylvania Supreme Court explained) nothing about that registration is "voluntary." 266 A. 3d, at 570, and n. 20.[8] Consent in *Pennsylvania Fire* was contained in the document itself; here it is deemed by statute. If "mere formalities" matter as much as the plurality says they do, it should respect this one too. *Ante*, at 144.

## IV

By now, it should be clear that the plurality's primary approach to this case is to look past our personal jurisdiction precedent. Relying on a factsheet downloaded from the internet, for instance, the plurality argues that Norfolk Southern is such a "part of 'the Pennsylvania Community,'" and

---

[8] I agree with the Court that no "magic words" are necessary to establish valid consent. *Ante*, at 136, n. 5. But when the statutory scheme itself distinguishes between actual "consent" and registration, §§ 5301(a)(2)(i), (ii), and when the Pennsylvania Supreme Court sees a difference between the two, it is quite a stretch to treat them as one and the same.

does so much business there, that its "presence" in Pennsylvania is enough to require it to stand for suits having nothing to do with the Commonwealth. *Ante*, at 141–143; see also *ante*, at 153–154 (opinion of ALITO, J.).[9]  In *Daimler*, however, we roundly rejected the plaintiff's request that we "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.'" 571 U. S., at 138.  The established test—which the plurality barely acknowledges—is whether the corporation is "at home" in the State.  "A corporation that operates in many places," and must therefore register in just as many, "can scarcely be deemed at home in all of them." *Id.*, at 140, n. 20.

\*    \*    \*

Critics of *Daimler* and *Goodyear* may be happy to see them go.  See, *e. g.*, *Ford Motor*, 592 U. S., at —— (ALITO, J., concurring in judgment); *id.*, at —— –—— (GORSUCH, J., joined by THOMAS, J., concurring in judgment); *BNSF*, 581 U. S., at 416 (SOTOMAYOR, J., concurring in part and dissenting in part).  And make no mistake: They are halfway out the door.  If States take up the Court's invitation to manipulate registration, *Daimler* and *Goodyear* will be obsolete, and, at least for corporations, specific jurisdiction will be "superfluous." *Daimler*, 571 U. S., at 140; see *Goodyear*, 564 U. S., at 925.  Because I would not work this sea change, I respectfully dissent.

---

[9] Mallory, by contrast, chooses to rest his case for jurisdiction on registration and registration alone.  Tr. of Oral Arg. 49 ("We're relying on consent and consent alone.  Without consent, we don't prevail").  Apparently dissatisfied with this concession, the plurality finds its own facts and develops its own argument.  That is not how we usually do things.  See *United States* v. *Sineneng-Smith*, 590 U. S. ——, —— –—— (2020).

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None